ACCEPTED
13-14-00363-CV
THIRTEENTH COURT OF APPEAL
CORPUS CHRISTI, TEXAS
2/10/2015 1:23:55 PM
DORIAN RAMIREZ
CLERK

CASE NO. 13-14-00363-CV
IN THE THIRTEENTH COURT OF APPEALS
STATE OF TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
2/10/2015 1:23:55 PM
DORIAN E. RAMIREZ
Clerk

| | |
|---|---|
| LONG ISLAND VILLAGE OWNERS ASSOCIATION, INC., ET. AL, <br><br> Appellants, <br><br> v. <br><br> MAURICE O. BERRY, <br><br> Appellee. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

## APPELLEE'S BRIEF

On Appeal from Cause No. 2011-DCL-1306
In the 107th Judicial District Court
Cameron County, Texas

Respectfully submitted,

THE LEFLER LAW FIRM
501 South Austin Avenue, Suite 1245
Georgetown, Texas 78626
T (512) 863-5658
F (866) 583-7294

*/s/ Sandra M. Lefler*

SANDRA M. LEFLER
Texas State Bar No. 12161040
slefler@leflerlegal.com

LEAD COUNSEL FOR APPELLEE

**NO ORAL ARGUMENT REQUIRED**

# TABLE OF CONTENTS

STATEMENT OF THE CASE ........................................................................... 1

BERRY'S STATEMENT REGARDING ORAL ARGUMENT ...................... 2

STATEMENT OF FACTS ............................................................................... 3

SUMMARY OF THE ARGUMENT ............................................................. 16

ARGUMENTS AND AUTHORITIES ......................................................... 18

    I.    ASSOCIATION'S MOTION FOR DIRECTED VERDICT WAS PROPERLY DENIED. ON REVIEW THIS COURT CAN ONLY CONSIDER THE GROUNDS FOR DIRECTED VERDICT ASSERTED BY ASSOCIATION IN THE TRIAL COURT, AND MUST DISREGARD THE EXTRANEOUS ARGUMENT CONTAINED IN ASSOCIATION'S BRIEF ..................................................................................................18

    II.   ASSOCIATION'S MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR NEW TRIAL WERE ALSO PROPERLY DENIED ...................................29

        A. Appellant Has Waived Its Right to Appeal the Jury's Award to Berry for the Cost to Repair His Sailboat ................................29

        B. Evidence of the Decrease in the Value of Berry's Residence was Properly Admissible and Considered by the Jury ........................ 45

        C. Berry Properly Established the Value of the Loss of Use and Enjoyment of his Property. ........................................................ 48

        D. Berry's Testimony In Support of his Mental Anguish Claim Satisfies the Texas Requirements for Recovery of Such Damages ..................................................................................................49

    III.   BERRY AS A PROPERTY OWNER HAD STANDING TO SUE ..................................................................................................52

IV.   ATTORNEY FEES WERE PROPERLY AWARDED GIVEN THE INEXTRICABLE NATURE IN WHICH THE CLAIMS WERE INTERTWINED.  BERRY CONCEDES THAT IF THIS COURT DISAGREES, THE CASE SHOULD BE REMANDED FOR FURTHER EVIDENCE REGARDING THE PERCENTAGE OF TIME BERRY'S COUNSEL DEVOTED TO EACH CLAIM ASSERTED.................................................................. 53

V.    THE EVIDENCE SUPPORTED THE COURT'S DECLARATORY JUDGMENT THAT THE ASSOCIATION HAS A DUTY TO DREDGE THE CANALS TO FIVE (5) FEET BELOW MEAN TIDE. .................. 58

VI.   CONCLUSION ................................................................ 59

VII.  PROOF OF SERVICE ...................................................... 61

VIII. CERTIFICATE OF COMPLIANCE ................................... 62

IX.   APPENDIX .................................................................... 63

ii

# INDEX OF AUTHORITIES

## CASE CITATIONS:

*Abdelnour v. Mid Nat'l Holdings, Inc.*,
190 S.W.3d 237 (Tex. App. – Houston [1st Dist.]
2006, no pet.) .................................................................... 23, 46, 48

*Adams v. Rowles*,
228 S.W.2d 849 (Tex. 1950) ................................................... 28

*Apolinar v. State*,
155 S.W.3d 184 (Tex. Crim. App. 2005) ................................ 29

*Badger v. Symon*,
661 S.W.2d 163 (Tex. App. Houston 1st Dist. 1983, writ st ref'd n.r.e.)
.................................................................................................. 33, 40

*Bavarian Auto Haus, Inc. v. Holland*,
570 S.W.2d 110 (Tex. Civ. App. – Houston [1st] 1978, no writ) ................ 46

*Batra v. Clark*,
110 S.W.3d 126 (Tex. App. – Houston [1st Dist.] 2003, no pet. ................ 18

*Boyer v. Scruggs*,
806 S.W.2d 941 (Tex. App.—Corpus Christi 1991, no writ) ...................... 32

*Boyles v. Kerr*,
885 S.W.2d 593 (Tex. 1993) ................................................... 51

*Brooks v. Northglen Association*,
141 S.W.3d 158 (Tex. 2004) ................................................... 52

*Brown v. Dale*,
395 S.W.2d 677 (Tex.Civ.App. -- Amarillo 1965, writ ref'd n.r.e.) ............ 33

*Chapman v. State*,
150 S.W.3d 809 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) ......... 45

*City of Keller v. Wilson*,
168 S.W.3d 813 (Tex. 2005) ................................................... 24

*City of Tyler v. Likes*,
962 S.W.2d 489 (Tex. 1997) ................................................... 51

*Cleveland Reg'l Med. Ctr., L.P. v. Celtic Properties, L.C.*,
323 S.W.3d 322 (Tex. App. – Beaumont 2010, pet. filed) ......................... 18

*Coleman v. Gournet*,
59 S.W. 2d 550 (Tex. App. – Houston [14th] 1993, writ dismissed) .......... 47

*Columbia Engineering International v. Dorman*,
602 S.W.2d 72 (Tex.Civ.App. -- Beaumont 1980, writ ref'd n.r.e.) ........... 33

*Cooper v. Lyon Fin. Servs., Inc.*,
65 S.W.3d 197 (Tex. App. – Houston [14th Dist.] 2001, no pet. ........... 18, 19

*Cooper v. Tex. Gulf Indus., Inc.,*
    513 S.W.2d 200, 204 (Tex. 1974) ........................................................ 53
*Craig v. Allen,*
    556 S.W.2d 644 (Tex.Civ.App. -- Tyler 1977, writ ref'd n.r.e.) ................. 33
*Ford Motor Company v. Ezequiel Castillo, et al.,*
    444 S.W. 3d 616 (Tex. 2014) .............................................................. 24
*Gulf., C. & S.F. Ry. Co. v. Cusenberry,*
    26 S.W. 43, 45 (1894) ...................................................................... 52
*Gulf State Utils. Co. v. Low,*
    79 S.W.3d 561, 567 (Tex. 2002) ........................................................ 54
*Haynes, & Boone, L.L.P. v. Chason,*
    81 S.W.3d 307, 309 (Tex. App. – Tyler 2001, pet. denied) ...................... 18
*In re Price's Estate,*
    375 S.W.2d 900, 904 (Tex. 1964) ...................................................... 21

*Izen v. Comm'n for Lawyer Discipline,*
    322 S.W.3d 308, 322 (Tex. App. – Houston [1st Dist.]
    2010, pet. denied) .................................................................. 23, 46, 48
*Jones v. Smith,*
    157 S.W.3d 517 (Tx. Ct. App. – Texarkana 2005) ................................. 53
*Kollision King v. Calderon,*
    968 S.W.2d 20 (Tex. App. – Corpus Christi 1998, no pet.) ...................... 49
*Latham v. Castillo,*
    972 S.W.2d 66, 70 (Tex. 1998) .......................................................... 50
*Parkway Company v. Woodruff,*
    901 S.W.2d 434, 444 (Tex. 1995) ...................................................... 50
*Precheck, Inc. v. Quick Check Records, Inc.,*
    2014 Tex. App. LEXIS 6863 (June 26, 2014) ...................................... 31
*Raman v. Chandler Properties, L.C. v. Caldwell's Creek Homeowner's Association,*
    178 S.W.3d 384, 394 (Tex. App. – Ft. Worth, 2005) .......................... 27, 28
*Slayden v. Palmo,*
    108 Tex. 413, 194 S.W. 1103 (1917) .................................................. 33
*St. Elizabeth Hosp. v. Garrard,*
    730 S.W.2d 649, 650 (Tex. 1987) ...................................................... 51
*Stewart Title Co. v. Sterling,*
    822 S.W.2d 1, 11, 12 (Tex. 1991) .......................................... 54, 55, 56
*Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.,*
    106 S.W.3d 118, 128 (Tex. App. – Houston [1st Dist.]
    2002, pet. denied) .................................................................. 23, 46, 48

*Tony Gullo Motors I, L.P. v. Chapa,*
      212 S.W.3d 299 (Tex. 2006) .......................................54, 55, 56, 57
*Vasquez v. State,*
      2008 Tex. App. LEXIS 2952 (Tex. App. Corpus Christi Apr. 24, 2008)
      .........................................................................................43, 44

## STATUTES AND OTHER AUTHORITIES:

Tex. Bus. & Com. Code §§17.01, *et seq.* ............................................. ĭ

Tex. Civ. Prac & Rem Code §37.006(a), §39 .....................................53

Tex. Civ. Prac & Rem Code §38.001(8) ............................................54

Texas Local Government Code §212.004(a), §212.004(d), §212.045 ...................27

Texas Rules of Appellate Procedure, Rule 33.1(a) ...............................32

Texas Rules of Appellate Procedure, Rule 38.1 (i) ....................... 16, 23, 30, 31, 45

Texas Rules of Evidence - Rule 103 (a) (1) ......................................32

Texas Rules of Evidence - Rule 103 (a) (2) ......................................40

Texas Rules of Evidence - Rule 802 ........................................43, 44

Texas Rules of Evidence - Rule 803 ..............................................30

# TABLE OF CONTENTS

STATEMENT OF THE CASE .................................................................. 1

BERRY'S STATEMENT REGARDING ORAL ARGUMENT ...................... 2

STATEMENT OF FACTS ..................................................................... 3

SUMMARY OF THE ARGUMENT ......................................................... 16

ARGUMENTS AND AUTHORITIES ....................................................... 18

    I.    ASSOCIATION'S MOTION FOR DIRECTED VERDICT WAS PROPERLY DENIED. ON REVIEW THIS COURT CAN ONLY CONSIDER THE GROUNDS FOR DIRECTED VERDICT ASSERTED BY ASSOCIATION IN THE TRIAL COURT, AND MUST DISREGARD THE EXTRANEOUS ARGUMENT CONTAINED IN ASSOCIATION'S BRIEF ................................................................ 18

    II.    ASSOCIATION'S MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR NEW TRIAL WERE ALSO PROPERLY DENIED ............................... 29

        A. Appellant Has Waived Its Right to Appeal the Jury's Award to Berry for the Cost to Repair His Sailboat ............................... 29

        B. Evidence of the Decrease in the Value of Berry's Residence was Properly Admissible and Considered by the Jury ....................... 45

        C. Berry Properly Established the Value of the Loss of Use and Enjoyment of his Property. ........................................ 48

        D. Berry's Testimony In Support of his Mental Anguish Claim Satisfies the Texas Requirements for Recovery of Such Damages ................................................................ 49

    III.    BERRY AS A PROPERTY OWNER HAD STANDING TO SUE ................................................................ 52

IV.    ATTORNEY FEES WERE PROPERLY AWARDED GIVEN THE INEXTRICABLE NATURE IN WHICH THE CLAIMS WERE INTERTWINED. BERRY CONCEDES THAT IF THIS COURT DISAGREES, THE CASE SHOULD BE REMANDED FOR FURTHER EVIDENCE REGARDING THE PERCENTAGE OF TIME BERRY'S COUNSEL DEVOTED TO EACH CLAIM ASSERTED ................................................................................ 53

V.    THE EVIDENCE SUPPORTED THE COURT'S DECLARATORY JUDGMENT THAT THE ASSOCIATION HAS A DUTY TO DREDGE THE CANALS TO FIVE (5) FEET BELOW MEAN TIDE. ................... 58

VI.    CONCLUSION ........................................................................ 59

VII.    PROOF OF SERVICE ............................................................ 61

VIII.    CERTIFICATE OF COMPLIANCE ..................................... 62

IX.    APPENDIX .............................................................................. 63

## STATEMENT OF THE CASE

*1.    Nature of the Case.*    Maurice O. "MO" Berry filed suit against Association for breach of contract, negligence, defamation, and violations of the Deceptive Trade Practices act ("DTPA"), Tex. Bus. & Com. Code §§17.01, *et seq.* Berry sought damages of $300,000.00 and declaratory and injunctive relief. *(R.R. 453-465).*

*2.    Course of Proceedings.*    This is an appeal from a final judgment following a jury trial. (Applnts' App. Tab A).

*3.    Trial Court's Disposition.*    Following a trial on the merits to a jury, the trial court denied Association's motion for a directed verdict. The jury charge issued on the breach of contract, negligence, and defamation causes of action only. (Applnts' App. Tab B). The DTPA and fraud claims were dismissed on directed verdict. The jury issued its verdict for Berry for breach of contract and negligence, and the trial court denied Association's motion for judgment notwithstanding the verdict. (Applnts' App. Tab B). On April 3, 2014, the trial court entered judgment on the verdict, granted Berry's request for declaratory judgment in part, and awarded Berry his attorney's fees. (Applnts' App. Tab A). The trial court denied Association's May 2, 2014 motion for new trial on June 5, 2014. (R.R.561).

**4.**    *Appellate Proceedings.*    Associations perfected their appeal to this Court on July 1, 2014.

1

# BERRY'S STATEMENT REGARDING ORAL ARGUMENT

No oral argument is necessary in this case. The suit involves common law claims of breach of contract, negligence, declaratory judgment, and Berry's award of attorney fees. The issues raised by Association require this Court to determine (a) whether the jury's verdict was properly entered by the trial court, (b) whether the trial court properly denied Association's motions for dismissal for lack of standing, directed verdict, judgment notwithstanding the verdict, and for new trial; and (b) whether the trial court properly awarded Berry the declaratory relief he sought. These issues are all adequately addressed through written submission. It is difficult to see any benefit to be derived from oral argument on such a basic case.

Contrary to Association's Statement, no public interests or policies are at issue in this case nor would public policy or public interests be furthered by this case. This is a private action by a private residential property owner against the homeowner's association where the property owner resided for claims arising from failure to maintain the premises.

## STATEMENT OF FACTS

### I. Introduction: Association's Statement of Facts is Deficient

Association's Statement of Facts omits several material facts presented in the evidence at trial upon which the jury reached its decision in favor of Berry. In other instances, Association emphasizes facts that are irrelevant to a determination of the issues before the Court. Sometimes, Association even fails to accurately state the facts as presented in the Record.

Berry provides the following comprehensive Statement of Facts, adopting in regular text any factual allegation of Association with which Berry agrees. Additional facts provided by Berry are set forth in ***bold italics.*** And all inaccuracies in Association's factual statements are identified and underscored, all as next set forth.

### II. Berry's Comprehensive Statement of Relevant Facts

1. This case concerns the maintenance of the limited common elements of a bayfront condominium development known as Long Island Village; specifically, the maintenance of a canal by the homeowners association, Long Island Village Owners Association (the "Association) (I R.R. 6-17). The Port Isabel, Texas development has 1,024 units, of which approximately 58 percent are situated on one of seven canals referred to by the letters A through G (IV R.R. at 14:20-25, 182:6-7) (V R.R. 41:15-21, 138:4-15). *[See Applnts' Stmt/Facts p. 1, ¶ 1]*

3

2. *In 2004, Berry M.O. "Mo" Berry ("Berry") began looking for boats and places where he could have a big boat. (III R.R. 54:21-25; 55:1-2). A realtor in Brownsville brought Berry to Long Island Village to look at properties. (III R.R. 56:2-6)(III R.R. 58:1-12; 59:23-25).*

3. *After that, from 2004 until early 2005, Berry went to Long Island Village on three different occasions to look at properties by himself. (III R.R. 58:13-20). He would spend a couple of weeks at a time going through Long Island Village, talking to owners, meeting with builders, and trying to look for property. (III R.R. 60:4-9).*

4. *Berry specifically spoke with people at Long Island Village about the canals and the canal system. (III R.R. 60:15-17). He met with two different builders who lived in Long Island Village, spending a day with each one of them. (III R.R. 60:17-25) They took Berry down to the canals and showed him what things look like when the canals are not properly maintained and how the corners filled up with sand. (III R.R. 61:1-4).*

5. *The builders also told Berry how he could get the plats of the subdivision from the management company. (III R.R. 61:4-6). The plats showed the original depths of the canals, all the property lines and their orientation to north, south, east, and west. The plat also showed how much waterfront property each lot had where you could put a dock and the size and how far out you could go*

4

*into the canal and not be encroaching on someone else coming into the canal. (III R.R. 61:11-19). For these reasons, the plats were very useful to Berry in trying to make a decision where to buy because not only did they show the orientation, where he could put a dock and how much waterfront property he had, but they also showed the depth at which the canals were built and the depth he understood that the canals would be maintained. (III R.R. 61:30-36; 62:1).*

6. The canals were constructed in 1977 by the original developer of the island, Outdoor Resorts South Padre Island, Inc. (VI R.R. 14:2-15:3). The property was subdivided (platted) in 1982. The canals were built to a depth of six-and-one-half feet at mean low tide, **which means the depth would be seven-and-a-half feet at mean low low water. (III R.R. 62:2-17),** and this is reflected in the original 1982 plats. (III R.R. 61:1-62:4) (IV R.R. 109:11-15). These original lots were leasehold. Long Island Village Owners Association is much later created (sic) when most owners or occupants had acquired fee interests. (VI R.R. at 15:12-18)(VIII R.R. 7). [Applnts' Stmt of Facts p. 1, ¶ 2].

7. *Berry played tennis with a member of the board of directors of the Association, and another former board member took Berry out on his boat and showed him the different canals with his depth finder, and showed him what he knew about the canals in that area. (III R.R. 63:18-25; 64:1-2). These are*

*people he could have asked questions of regarding the canals. (III R.R. 63:18-25, 64:1-2).*

8. *Berry also met with the general manager and the facilities manager, reviewed the plats with them, and discussed what they had been doing in dredging. They informed Berry that they had a ten-year dredging permit, that they had just finished dredging in 2004, and that their permit ran through 2010 (III R.R. 65:7-12), although in 2004 the only canal they did not dredge was Berry's because of the absence of a location to remove the spoils that would result from dredging that canal (Canal A). (III R.R. 69:7-14).*

9. *Before actually purchasing a property, Berry made bids on properties at Long Island Village and advised Long Island Village representatives that he planned on bringing in a large boat. (III R.R. 72:1-3). Another large boat was already on Canal C in Long Island Village – a 47-foot Vagabond. (III R.R. 72:4-16). In speaking with the other large boat owner, Berry was told by the other boat owner that he didn't have any trouble using his boat. (III R.R. 72:18-19). Berry also played tennis with a woman who had a 40-foot Morgan sailboat in Long Island Village. (III R.R. 73:11-13).*

10. *Berry's whole purpose for purchasing property at Long Island Village was to go sailing whenever he wanted to, find people who would sail for 2 to 3* weeks with him, and sail up and down the Mexican shore. (III R.R. 129:2-11).

6

*11. Berry received and reviewed a copy of the March 2005 Restatement of Declaration of Covenants, Conditions and Restrictions prior to purchasing the property ("Declarations") (III R.R. 63:2-25; 64:3-18; 65:4-18) (Plaintiff's Exhibit 1). He relied upon the Declarations in making his decision to purchase property at Long Island Village. (III R.R. 65:4-7).*

*12. The Declarations contained an express provision requiring the Association to maintain the canals as a limited common element in Long Island Village, a fact conceded and unopposed by the Association in its Appellant's Brief herein. (Appellant's Brf., p. 12 ¶ 3) ("...it is undisputed that the 2005 restatement defines the Associations duties, and . . . reasonably maintaining the canals is [among the duties].")*

*13. In 2005, Berry bought Lot # 92 on Canal A in the Long Island Village. (III R.R. 69:22-23; 70:1). He chose Lot 92 because it was the closest to the intercoastal waterway. (III R.R. 70:11-15).* Before purchasing the lot Berry reviewed the 1982 plats, and also personally measured the depth of the canals with plans to purchase a large boat. (III R.R. 61:1-62:4, 70:25-71:12). Berry knew that he could not sail directly from Canal A because silt blocked the way; rather, he would have to sail to Canal C and out from there. (III R.R. 70:9-71:6). He also knew that the Association had just dredged the canals in 2004, but had not dredged Canal A because of problems as to where to locate the spoils. (III R.R. 65:7-13,

7

69:7-13). Berry knew that the Association's dredging permit from the United States Army Corps of Engineers expired in 2010. (III R.R. 65:7-13). [Applnts' Stmt of Facts p. 2, ¶ 4].

14. In April 2006, 10 months after purchasing the home, Berry purchased a 40-foot Beneteau sailing boat with a five-and-a-half foot fixed keel. (III R.R. 75:16-76:14, 77:8-15)(IV R.R. 21:2-6, 32:20-21). "Right from the beginning" he encountered difficulty sailing the boat from Canal A. He could only leave the canal "within four or five hours" of high tide, and even then "[he] was pushing almost two-and-a-half feet of silt." (III R.R. 77:8-17). [Applnts' Stmt of Facts p. 2, ¶ 5].

15. In March 2008 Berry purchased a home in Georgetown, Texas (III R.R. 79:1-3, 80:18-22) (IV R.R. 21:15-19), *but the Georgetown home was his secondary home. His legal home and tax-exempt home was in Long Island Village and remained so through 2009. (IV R.R. 26:1-3). He remained in Port Isabel to attend to a business he owned. (IV R.R. 27:1-2).* Hurricane Dolly struck Port Isabel several months later on July 8, 2008. Berry moved to Georgetown between the second quarter of 2008 and the first of 2010. (IV R.R. 25:4-27:2). [Applnts' Stmt of Facts p. 3, ¶ 6].

16. On July 5, 2009 Berry made his first written complaint to the Association regarding their failure to maintain the canals, by email to Patricia Burke, the then-

8

president of the Association's board of directors. (III R.R. 83:14-21, 90:13-23). Ms. Burke responded stating that she had forwarded the email to the entire board of directors [Applnts' Stmt of Facts p. 1, ¶ 3].*and that they would consider dredging that year; and, if not, if the money didn't allow, they would put it in the budget for 2010." Ms. Burke stated that "[b]ecause this would involve getting permission from the Corp of Engineers to dredge and permission to locate any dredging materials off site, the entire board will have to discuss this at our August meeting" and that "depending upon the cost estimate, such a project may have to wait until next year to be included in our major improvement projects."* (IIIR.R. 83:14-21, 90:24-91:7). Berry considered Ms. Burke's response, and in particular the 2010 timetable, to *not* be *un*reasonable *for a project like that.* (III R.R 91:12-22). [Applnts' Stmt of Facts p. 3, ¶ ].

17. *Despite the Board's promises and some steps taken to look into dredging, no dredging ever occurred:*

> **A.** In their August 2009 meeting, the board of directors discussed the 2004 dredging, which had been limited in scope, and decided to consider dredging all of the canals, beginning with a survey to determine the condition of the canals. (V R.R. 72:3-17). Board member Thomas Bergsma was placed in charge of producing a report. (V R.R. 76:7-12). [Applnts' Stmt of Facts p. 3, ¶ 8].

9

**B.** Also, in August 2009, the board hired a new general manager, Richard Horner. (V R.R. 156:13-21). [Applnts' Stmt of Facts p. 4, ¶ 8].

**C.** The board met again January 27, 2010, at which a Bergsma-selected company bid approximately one million dollars for the project, "from survey to completion." (V R.R. 26:17-27:5, 86:14-87:1, 256:1-5). It became clear to the board members at this time that the expense of dredging would exceed the major improvements fund and require a special assessment. (V R.R. 138:16-139:6, 159:18- 160:9). [Applnts' Stmt of Facts p. 4, ¶ 9].*Despite the fact that special assessments had been instituted previously by Long Island Village to the homeowners, (III R.R. 67:23-25, 68:1-12), here no special assessment ever issued regarding dredging and a* motion was made and carried to table the dredging issue until the annual meeting of the owners in March. (V R.R. 78:4-79:8, 86:14-87:1). [Applnts' Stmt of Facts p. 4, ¶ 9].

**D.** The board did discuss obtaining an extension of the Association's dredging permit, then set to expire in December 2010. (V R.R. 76:13-77:8). Ms. Burke tasked Richard Horner with obtaining the extension, describing it as "very important," to obtain the extension "as soon as possible." (V R.R. 160:3-15). Mr. Horner made his first request for an extension on February 23, 2010. (V R.R. 159:22-25). [Applnts' Stmt of Facts p. 4, ¶ 9].*The request for an extension was rejected because the Board did not have an*

*approved site for the spoils. (V R.R. 83:16-18). As a result, the permit expired without a renewal. (V R.R. 84:16-17).*

E.  After Berry gave a presentation at the March meeting of the Association's members, the dredging proposal was voted down by a show of hands. (V R.R. 80:13-19, 81:25-82:2). 588 members were present; 66 more than needed for a quorum. (V R.R. 120:19-121:1).  [Applnts' Stmt of Facts p. 4, ¶ 10].*However, the Board spoke with the owners at the meeting and determined that the owners did not have enough information regarding the dredging situation.  "A lot of them just voted one way or the other. And it was – it wasn't clear to them, to the board felt they needed to go further and get more information." (V R.R. 82:12-18).  The Board could not give them a cost, and that was one of the first things they wanted to know.  (V R.R. 82:20-21).*

F.  Going forward, the dredging issue was discussed at almost all—at least 75 percent—of the meetings of the board. (V R.R. 86:5-8, 98:1-10). [Applnts' Stmt of Facts p. 5, ¶ 11].*But no dredging ever occurred.*

G.  The Corps of Engineers required that an application for a new dredging permit be submitted. (V R.R. 84:5-85:22, 88:24-89:14, 90:12-92:2, 175:7-24). Submitting a new application is a tedious process that cannot be quickly or inexpensively done (V R.R. 176:13-177:12). Mr. Horner testified

11

at length and in detail as to his obtaining a new permit for the Association; which, as with the application for an extension, was complicated by the need to find an environmentally-sound location for the spoils (or, more expensively, barge them), and by various bureaucratic snafus. (V R.R. 90:12-92:2, 159:22-236:2). Though the board quickly approved a survey, which was conducted in August 2011, it was not until April 2013 that the Corps granted the Association a new permit to dredge the canals. (V R.R. 181:22-182:5, 227:16). [Applnts' Stmt of Facts p. 5, ¶ 11].

H.     In November 2013 the board produced a final scope of work and solicited final bids. (V R.R. 231:20-24). Finally, in January 2014, the board approved an $832,000 bid to dredge the canals *but only* to a depth of five feet (V R.R. 232:9-234:2), *not the six and one-half feet necessary for Berry to move his boat through the canals.* [Applnts' Stmt of Facts p. 5, ¶ 11].

18.    Meanwhile, on February 22, 2011, Berry brought the underlying suit against the Association asserting, among others, breach of contract and negligence causes of action, for failure to maintain the canals to a depth of six-and-a-half feet. Berry's deed was not offered in evidence at trial (IV R.R. 109:25-110:24), [Applnts' Stmt of Facts p. 6, ¶ 12], *although his ownership of Lot # 92 on Canal A in Long Island Village was undisputed.* The Association's declarations of covenants and by-laws *failed to* reference, ratify, or adopt the 1977 or 1982 plats

12

(V R.R. 93:25-94:15) (*Declaration, P's Exh. 1,* VIII R.R. 6-47), *although the Declarations did not expressly contradict them in any respect either (Declaration, P's Exh. 1, VIII R.R. 6-47).* The Declarations require that the Association maintain the *canals as part of the* common elements, but *fail to specify the time, frequency, or depth of the dredging.* (III R.R. 69:10-24) (V R.R. 93:6-14) (VIII R.R. 6-47). [Applnts' Stmt of Facts p. 6, ¶ 12].

19.    At trial Berry claimed damages for repairs to his boat, offering as proof two ~~unproven~~ repair estimates admitted over the Association's hearsay and business records objections. (III R.R. 115:16-127:5).   [Applnts' Stmt of Facts p. 6, ¶ 13].

20.    Berry testified as to the loss of use of his boat, based on the cost of chartering a similar vessel. *His testimony established that the cost of chartering a boat can be $900 per day without a captain. (III R.R. 127:14-17).* Berry also offered, over the Association's objection, his opinion that his home had diminished in value by approximately $10,000 as a result of "the lack of dredging." (III R.R. 129:14-131:9). Finally, Berry testified that he suffered mental anguish as a result of the diminishment of his home's value, which he described as:

A.  *Causing him a lot of anguish;*

B.  *Suffering heart angina, having to be treated for angina, and still being treated for it;*

13

**C.** *Treatment for depression, and still being treated for it, and* a worsening of pre-existing depression "over the years" *requiring a change of his medication* (III R.R. 131:10-132:22). No expert or other testimony was offered to substantiate Berry's damages. (III. R.R.115:16-134:2), *but as a matter of law in Texas no such expert testimony was required.*

[Applnts' Stmt of Facts p. 6, ¶ 13].

21. At the close of evidence the Association moved for a directed verdict on each of Berry's claim which was denied as to the breach of contract, negligence, defamation, and declaratory judgment claims. (V R.R. 44-56). On February 10, 2014, the jury returned a verdict upon the competition of a trial on the merits. (C.R. 469-484). The jury found that the Association had breached the declarations by "failing to dredge the canals." (C.R. 474). The jury also found that the Association acted negligently, and that such negligence proximately caused Berry harm. (C.R. 474). The jury awarded Berry $17,000 for damage to his sailboat; $5,000 for the decrease in the value of his home; $75,000 for loss of use; and $50,000 for mental anguish. (C.R. 476). Defendant moved for judgment notwithstanding the verdict, and for a new trial, both of which were denied. (C.R. 510-518, 556-561). Final judgment on the jury's verdict was entered on April 3, 2014, and included a declaratory judgment that the Association shall dredge Canal A to a depth of five feet below mean sea level, and also an award of attorney's fees in the amount of

14

$75,900 (and $7,500 in the event of an appeal, and an addition $5,000 in the event of an appeal to the Supreme Court of Texas). (C.R. 523-550). [Applnts' Stmt of Facts p. 7, ¶ 14].

# SUMMARY OF THE ARGUMENT

I.     The Association's motion for directed verdict was properly denied. On review, this Court can only consider the grounds for directed verdict asserted by the Association in the trial court, and must disregard the extraneous argument contained in the Association's brief.

II.    The Association's motions for judgment notwithstanding the verdict and motion for new trial were also properly denied.

   A. Appellant has waived its right to appeal the jury's award to Berry for the Cost to Repair his sail boat.

      1. The Association failed to comply with Tex. R. App. P.38.1(i)

      2. Appellant failed to preserve the alleged errors.

         a. The Association did not timely object to Berry's exhibits and testimony.

         b. Any error by admitting Berry's Exhibits 4 and 5 was harmless because the exhibits were cumulative of Berry's oral testimony to which the Association did not object.

   B. Evidence of the decrease in the value of Berry's residence was properly admissible and considered by the jury.

   C. Berry properly established the value of the loss of use and enjoyment of his property.

   D. Berry's testimony in support of his mental anguish claim satisfies the Texas requirements for recovery of such damages.

III.   Berry as a property owner had standing to sue.

16

IV.     Attorney fees were properly awarded to Berry's counsel, given the inextricable nature in which the claims were intertwined. Berry concedes this if this Court disagrees, the case should be remanded for further evidence regarding the percentage of time Berry's counsel devoted to each claim asserted.

V.      The evidence supported the Court's declaratory judgment requiring the Association to dredge the canals to five (5) feet below mean tide.

## ARGUMENTS AND AUTHORITIES

I.    **ASSOCIATION'S MOTION FOR DIRECTED VERDICT WAS PROPERLY DENIED. ON REVIEW THIS COURT CAN ONLY CONSIDER THE GROUNDS FOR DIRECTED VERDICT ASSERTED BY ASSOCIATION IN THE TRIAL COURT, AND MUST DISREGARD THE EXTRANEOUS ARGUMENT CONTAINED IN ASSOCIATION'S BRIEF**

1.    Association's first argument is that the trial court erred in failing to grant Association's motion for directed verdict on Berry's breach of contract and negligence claims. Association was the defendant in the trial court below. Nowhere does Association provide this Court with the legal authorities setting forth the standard upon which its review should be conducted, opting instead to make the global remark that the Court's denial of the directed verdict was "against the great weight and preponderance of the evidence." Berry first provides the Court with the applicable standard of review.

2.    A directed verdict in favor of a defendant may be proper when (1) a plaintiff *fails to present evidence raising a fact issue* essential to the plaintiff's right of recovery, or (2) the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. A challenge to the *denial* of a directed verdict is, in essence, a challenge to the legal sufficiency of the evidence. *Cleveland Reg'l Med. Ctr., L.P. v. Celtic Properties, L.C.,* 323 S.W.3d 322, 346 (Tex. App. -- Beaumont 2010, pet. filed); *Haynes, & Boone, L.L.P. v. Chason,* 81 S.W.3d 307, 309 (Tex. App.—Tyler 2001, pet. denied). In reviewing a trial court's denial of a motion for directed verdict, the court on appeal is limited to the specific grounds stated in the motion. *Batra v. Clark,* 110 S.W.3d 126, 128 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *Cooper v. Lyon Fin.*

18

*Servs., Inc.*, 65 S.W.3d 197, 207 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

3.    In the instant case, the Association made an oral motion for directed verdict upon the close of Berry's evidence; and, upon the close of the Association's evidence the Association reasserted that motion together with a motion for directed verdict on Berry's negligence claim. These motions for directed verdict were denied. Limiting this Court's review to the specific grounds asserted by the Association at trial, we see that much of the argument asserted in Association's Brief before this Court must be ignored as it far exceeds the limited grounds raised by Association before the trial court. The Record before the trial court shows the following *limited* argument:

### On Berry's Breach of Contract Claim:

"MR. RENE OLIVEIRA Jr.:   At this time, Your Honor, we would move for a directed verdict on all claims. To go through individually, Your Honor, on the breach of contract claim, Your Honor, the only contract we have in this case is the declaration and the bylaws.

We have admitted that the declaration states that we have a duty to maintain the canals. But there is nothing in the declaration that says the canals have to be dredged at certain times, in a certain manner, to a certain depth, at a certain frequency. There's nothing in those documents that say that.

And those are the only – the only contracts we have in this case. So since we've – there's been no breach of those contracts, Your Honor, we move for directed verdict on the breach of contract claim.

THE COURT:   All right. That'll be denied.

[V R.R. 48:14 – 49:4]

\* \* \*

"MR. RENE OLIVEIRA JR.:   We are asking for a directed verdict on the claim for breach of contract as well, Your Honor, simply because there's nothing

19

in the declaration that says we have to dredge to a specific depth or at a specific time.

THE COURT: That'll be denied. . . . ."

[VI R.R. 111:5-10].

Thus, the only grounds raised for directed verdict as to breach of contract was that while the Declarations themselves, by the Association's own admission, obligated the Association to reasonably maintain the canals, the Association argues that this contract did not specify the depth for maintaining the canals, and that Berry's "only evidence" that the Association had a duty to maintain the canals "was the original plat from the Long Island Village area showing that the canals were originally dug . . . to a depth of six-and-a-half-feet." (Applnt's Brief, p. 11, ¶ 1). This is a gross understatement of the evidence at trial.

4.     Looking at the evidence before the trial court, we see that both sides presented evidence on the issue of contractual obligations regarding maintenance of the canal. As acknowledged by the association, Berry offered proof including not only the Declarations (*Declarations, P's Exh. 1,* VIII R.R. 4), but also testimony as to the original Plat of the subdivision that identified the canals and showed their depth as six-and-one-half feet. (III R.R. 61:4-6, 61:9-25, 62:1-24). In addition, Berry introduced evidence (consistent with the Declaration's obligation for the Association to maintain the canals and the Plat's indication of the canal depth) that the Association's Board members assured Berry that the Association was operating under a current dredging permit issued by the Corp of Engineers who oversaw and regulated the dredging, and that the permit

20

was good through 2010. (III R.R. 65:7-12). Other evidence further confirming the contractual obligation of the Association included Berry's consultations with an Association Board member who took Berry out on his own boat and showed Berry different canals in that area. (III R.R. 63:18-25; 64:1-2). He met with the general manager and the facilities manager, reviewed the plats with them, and discussed what they had been doing in dredging. They informed Berry that they had a ten-year dredging permit, that they had just finished dredging in 2004 and their permit ran through 2010 (III R.R. 65:7-12). Berry informed Long Island Village representatives that he planned on bringing in a large boat. (III R.R. 72:1-3). He observed other large boats already on Canal C in Long Island Village – a 47-foot Vagabond. (III R.R. 72:4-16). Berry spoke with another large boat owner who told him he didn't have any trouble using his boat. (III R.R. 72:18-19). Berry played tennis with a woman who had a 40-foot Morgan sailboat in Long Island Village, making Berry aware of yet another large boat in the Village. (III R.R. 73:11-13). Despite the Association's appellate arguments to the contrary, there is no question that the jury was presented with substantial evidence supporting the contractual provisions and the actual confirmation of those provisions in practice.

5.     Where a controverted issue of material fact exists, a directed verdict is not appropriate. *See In re Price's Estate,* 375 S.W.2d 900, 904 (Tex. 1964).     Thus, confronted with the evidence presented by both sides regarding the duties and obligations of the Association with respect to the canal maintenance, the Court did the only thing it could do under the law and allow the issue to go to the ultimate fact finder: The Jury.

21

The jury was then free to weigh the evidence and obviously came to its conclusion in favor of Berry.

6. As to the denial of directed verdict on the negligence claim, the Association's sole anemic argument before the trial court was that this is strictly a breach of contract case, not one arising in negligence:

**On Berry's Negligence Claim:**

"MR. RENE OLIVEIRA JR.: We also would like to move for directed verdict at this time, Your Honor, on the claim for negligence. We believe that this is clearly a case of, you know, what was [sic] our duties under the declaration. It's a breach of contract case.

So – and, Your Honor, you've heard all the efforts that we've made, and really all the evidence in this case has been about whether we met our duties under the agreements.

So we believe that that's the question that should go to the jury because it's not a negligence case, and we're asking for a directed verdict on the claim for negligence.

"THE COURT: It'll be denied."

[VI R.R. 110:15 – 111:3] Frankly, the Association provided no argument whatsoever to the trial court in support of this issue. Therefore, this Court must ignore all additional arguments set forth in the Association's brief on appeal because they fall outside the scope of the limited argument presented to the trial court. This leaves the Association with merely the above conclusory statements presented to the trial court without any factual support or support of legal authorities. This is inadequate to preserve this issue for this Court's consideration.

22

Under Rule 38.1(i) of the Texas Rules of Appellate Procedure: A brief must contain clear and concise argument, with appropriate citations to authorities and the record. Without more, the Association has thereby waived the issue. "Rule 38 requires [a party] to provide us with such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue." *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). "This is not done by merely uttering brief conclusory statements, unsupported by legal citations." *Id.* "Issues on appeal are waived if an appellant fails to support his contention by citations to appropriate authority . . . ." *Abdelnour v. Mid Nat'l Holdings, Inc.*, 190 S.W.3d 237, 241 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Similarly, as this Court is well aware, appellate issues are waived when the brief fails to contain a clear argument for the contentions made. *Izen v. Comm'n for Lawyer Discipline*, 322 S.W.3d 308, 322 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Therefore, Association's argument as to directed verdict on the negligence claims must be denied.

7.     The Association goes on to argue that the evidence was not sufficient to support the jury's verdict and that directed verdict should have been awarded. As established by the Texas Supreme Court:

> "A legal sufficiency challenge will be sustained when the record confirms either: (a) a complete absence of a vital fact; (b) the

court is barred by rules of law or of evidence from giving weight to only the evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 819 (Tex. 2005)."

*Ford Motor Company v. Ezequiel Castillo, et al.*, 444 S.W. 3d 616 (Tex. 2014). In a legal sufficiency review, the appellate court must view the evidence in the light most favorable to the verdict. *Id.* at 620 (citing *Keller* at 822). When reviewing all of the evidence in the light favorable to the verdict, "courts must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their legal sufficiency review." *Id.* at 620-621 (citing *Keller at 821*). When reviewing circumstantial evidence that favors the verdict, we must "view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances." *Id.* (citing *Keller* at 813-14). If circumstantial evidence, when viewed in light of all the known circumstances, is equally consistent with either of two facts, then neither fact may be inferred; but where circumstantial evidence is not equally consistent with either of two fact, and the inference drawn by the jury *is within the "zone of reasonable disagreement,"* a reviewing court cannot substitute its judgment for that of the trier-of-fact. *Id.* (citing *Keller* at 822).

8.     Here, the Association argues that the evidence was insufficient to support a verdict for breach of contract and negligence, and goes so far as to state that "there is <u>no contract</u> requiring the Association to dredge the canals to a depth of six-and-a-half feet". Yet, the Association in the very next sentence of its brief admits that it <u>did</u> have the affirmative obligation to "reasonably maintain the canals". (Applnt's Brief, p. 14, ¶ 4). For the Association to argue the absence of a "6-1/2 foot dredging contractual obligation" misses the point. The real issue before the trial court was a determination of what constitutes "reasonable maintenance". The jury had all of the same evidence before it as set forth above with which to determine what constituted "reasonable maintenance" under the circumstances, and it did so, finding that the Association breached that obligation with the type of maintenance it was performing and, further, that the Association was negligent in its failure to properly maintain the canals, even after being repeatedly asked to do so by Berry. What constitutes "reasonable maintenance" was established by circumstantial evidence of the surrounding circumstances, the practices and history of the Association, the plat requirements for the canals, the accommodation of other large boats, and the prior issuance of special assessments when necessary to pay for a costly maintenance issue by the association. Taking all of this into consideration, the jury determined fault on the part of the Association. This Court cannot now substitute its own judgment for that of the jury.

9. Because the evidence was legally sufficient to support the jury's verdict, it should be upheld and the Association's argument for reversal denied.

The Deed was Not a Necessary Piece of Evidence

10. On a separate note, in support of its directed verdict argument the Association argues that Berry's deed of conveyance documenting his ownership of his home was not introduced into evidence at the trial; and, that without the Deed, there was no "proof" that Berry's property incorporated the Plat restrictions. This argument is wholly without merit and represents a complete misunderstanding of what a plat is.

11. Berry's ownership of Lot 92 in Long Island Village was affirmatively established by Berry without any objection of the Association. (III R.R. 69:22-23; 70:1). Further, the Association itself acknowledged Berry's review of the 1982 plat prior to purchasing Lot 92 (see Applnt's Brief, p. 2, ¶ 4). Thus, with Berry's ownership of the Lot and the existence of the recorded plat not at issue, no need existed for entering the deed into evidence at trial.

12. The Association's argument is based upon a complete misrepresentation or misinterpretation of the law. Association argues that a plat is nothing more than a "construction document" and that "a recorded plat is not binding unless it is adopted by reference on a deed." (Applnt's Brief, p. 24, ¶ 17). This is ludicrous. A plat is part of the subdivision process. It is mandatory, and it

26

is approved and filed of record *long before deeds are ever issued transferring title to the resulting lots in the subdivision.* The Texas Local Government Code ("TLGC") establishes the minimum legal framework for the subdivision process. The term "subdivision plat" or more simply "plat" refers to a legal document required any time the owner of a tract of land divides the tract into two or more parts to lay out a subdivision of the tract. TLGC § 212.004(a). The plat must be filed and recorded at the office of the County Clerk following approval by the applicable jurisdiction review authority. TLGC §212.004(d). Any person proposing to develop a tract must have a development plat of the tract prepared and approved. § 212.045. The plat sets forth the layouts of streets, easements, utilities, rights of way, lot sizes and locations, and the like. Nowhere in the Code is "adoption" in a deed required to <u>validate</u> the plat. Once a deed is thereafter issued transferring ownership of any of the lots identified in the Plat to this parties, the developer is no longer permitted to change the Plat or issue easements or other modifications of the use of the platted lands without involvement of the new property owners (*see Raman v. Chandler Properties, L.C. v. Caldwell's Creek Homeowner's Association,* 178 S.W.3d 384, 394 (Tex. App. – Ft. Worth, 2005)), the reason being that the provisions set forth in the plat, and all of them (including notations, boundary lines, survey information, and the like) are by inference incorporated into each conveyance subsequent to the plat approval and recording.

27

13. In support of its argument, Association cites completely distinguishable and irrelevant cases. For example, in *Adams v. Rowles*, 228 S.W.2d 849 (Tex. 1950) cited by Association, the court determined that reference to an underlying plat in a deed places the grantee on notice of the plat provisions and the grantee cannot avoid those provisions. Association's next case,

14. *Raman v. Chandler Properties, L.C. v. Caldwell's Creek Homeowner's Association*, 178 S.W.3d 384, 394 (Tex. App. – Ft. Worth, 2005), concerned a developer's attempt to grant an easement across common area lands in a development to third parties after lots had already been sold. The *Raman* court mentioned that the deeds of those property owners granted them all rights under the restrictive covenants, which means that once deeds were issued, the developer could no longer grant an easement because it would impair the current lot owner's property rights to those common areas. *Nowhere* is any reference made to a deed having to "adopt" those existing restrictive covenants. *Anderson, Clement*, and *Home*, all cited by Association at page 25 of its Brief, provide that reference to a plat in a deed incorporates the details of the plat. However, nowhere does Association cite to any legal authorities stating that plat provisions are only applicable to lands if they are expressly referenced in the deed. By virtue of the very platting process, a tract is divided into lots and blocks. Where that occurs, deeds then go on to reference the plat map which established those very lots and

blocks; without such a reference, the legal description would be incomplete as it would not indicate the subdivision at issue.

15. With Berry's ownership of the Property affirmatively established without dispute from Association, and the fact that the Plat covered the subdivision was also affirmatively established, the jury was free to take the information contained within the plat into consideration in determining the Association's obligations to the property owners such as Berry. The jury did just that and found in favor of Berry. Directed verdict was inappropriate, as Berry established the elements of his claims and the outcome was appropriately then given to the jury.

## II. ASSOCIATION'S MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR NEW TRIAL WERE ALSO PROPERLY DENIED

### A. Appellant Has Waived Its Right to Appeal the Jury's Award to Berry for the Cost to Repair His Sailboat.

16. The court reviews a trial court's decision to admit evidence over objection under an abuse of discretion standard and will not reverse that decision absent a clear abuse of discretion. *Apolinar v. State*, 155 S.W.3d 184, 185 (Tex. Crim. App. 2005).

### 1. The Association Failed to Comply with Tex. R. App. P. 38.1 (i).

17. The Association's contention that the trial court erred in admitting Plaintiff's Exhibits 4 and 5 into evidence should be overruled because Association

29

has failed to comply with the explicit requirements of the Texas Rules of Appellate Procedure regarding making a proper appellate argument (Tex. R. App. P. 38.1 (i)). 18. At page 15 of the Association's Appellate Brief, Section II, "Judgment Notwithstanding the Verdict, New Trial" the Association asserts that:

> The trial court erred in admitting plaintiff's exhibits four and five (invoices) as evidence of damage to the Plaintiff's boat. Counsel for the Association objected under the hearsay rule (Tex. R. Evid. 803) to the introduction of those exhibits as there was no business records affidavit on file to except the documents from the operation of the hearsay rule, and Berry was incompetent to testify as to the reasonableness and necessity of the repairs purportedly evidenced by the admitted documents. The trial court erred in admitting the exhibits as evidence of damages, and the jury's award of $17,000 in damages to Berry's sailboat is unsupported by the evidence, is against the great weight and preponderance of the evidence, and is unreasonable; and thus the trial court additionally erred in denying the Association's motions for judgment notwithstanding the verdict and/or for a new trial. (C.R.476).

19. While the above may sound like the introductory paragraph of a legal argument which will immediately follow, in fact, **the above paragraph comprises the entirety of the Association's [legal] argument regarding the $17,000 awarded to Berry for the cost to repair his sailboat.**

20. Texas Rules of Appellate Procedure, Rule 38.1 (i) requires the Association to make a "clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Clearly the Association has failed to comply with this requirement when arguing that the jury award is

30

unsupported by the trial evidence.

21. For this reason alone, the Court can overrule this issue on appeal. The Association's failure is not unlike the case of *Precheck, Inc. v. Quick Check Records, Inc.* 2014 Tex. App. LEXIS 6863 (June 26, 2014), where appellant Precheck disputed the amount of the judgment and argued that the judgment was insufficient. Yet PreCheck's appellate brief contained only a cursory citation to the company's evidence without providing any specific citation to the portion of the record it found objectionable or incomplete. *Id.* at 10. The court overruled PreCheck's appeal on this issue.

22. Likewise in the instant appeal, Association's contention that the jury's award is not supported by the evidence because the trial court erred in admitting Plaintiff's Exhibits 4 and5 into evidence should be overruled for failure to comply with Tex. R. App. P. 38.1 (i).

**2. Appellant Failed to Preserve the Alleged Errors.**

23. Even if the Association had complied with Tex. R. App. P. 38.1(i) above-- sufficient for this Court to determine if the trial court erroneously admitted Berry's Exhibits 4 and 5 into evidence, the Association has still waived its right to raise this issue on appeal because: a) the Association did not timely object to Exhibits 4 and 5 and Berry's testimony regarding same; and b) it was harmless error.

31

a. The Association Did Not Timely Object to Berry's Exhibits and Testimony.

24. Association argues that the trial court's admission into evidence of Berry's Exhibits 4 and 5 was erroneous. However, error may not be predicated upon a ruling which admits or excludes evidence **unless** a substantial right of the party is affected, *and* a timely objection or motion to strike appears of record, stating the specific ground of objection.... (Tex. Evid. R. 103 (a) (1), emphasis added.)

25. In order to preserve error for review on appeal, the defendant must make a specific, timely objection, and receive an adverse ruling at trial. Tex. R. App. P. 33.1(a). And, you must object when the evidence is offered, not later. *Boyer v. Scruggs,* 806 S.W.2d 941, 946 (Tex. App.—Corpus Christi 1991, no writ).

26. Barry's Exhibit 4 described the repair work needed to repair the bottom of the sailboat and apply a new barrier coat at a cost of $12,491.16. Exhibit 5 described additional work needed to repair the metal keel of the sailboat, cleaning, compounding and waxing the hull, and replacing the propeller. The cost to perform this work pursuant to Exhibit 5 was between $13,700 and $16,800. While the Association did ultimately object to the introduction of these exhibits on hearsay grounds (page 15 of the Association's Appellate Brief, Section II,

32

"Judgment Notwithstanding the Verdict, New Trial"), those objections were not timely made for purposes of preserving the trial court's alleged error on appeal. Further, the Association did not request a "running objection" from the court regarding the Exhibits, nor Berry's testimony thereon.

> It is well settled that admission of improper testimony is waived when testimony to the same effect has been permitted without objection. *Slayden v. Palmo*, 108 Tex. 413, 194 S.W. 1103 (1917); *Brown v. Dale*, 395 S.W.2d 677 (Tex.Civ.App. -- Amarillo 1965, writ ref'd n.r.e.); *Columbia Engineering International v. Dorman*, 602 S.W.2d 72 (Tex.Civ.App. -- Beaumont 1980, writ ref'd n.r.e.). **Even the trial court's admission of evidence over objection is deemed to be harmless where the objecting party subsequently permits the same or [165] similar evidence to be introduced without objection.** *Slayden v. Palmo, supra; Craig v. Allen*, 556 S.W.2d 644 (Tex.Civ.App. -- Tyler 1977, writ ref'd n.r.e.).

*Badger v. Symon*, 661 S.W.2d 163, 164-165 (Tex. App. Houston 1st Dist. 1983), emphasis added.

27.    Consequently, the below facts show that Association has waived this issue on appeal.

<u>EXHIBIT 4:</u>

28.    As shown verbatim below, before Berry attempted to introduce Exhibit 4 into evidence, his attorney Lecia Chaney ("Ms. Chaney") posted Exhibit 4 on the Elmo for the judge and jury to view (with no objection from Association).

33

Ms. Chaney then proceeded to ask Berry questions about the Exhibit 4 and his damages. It was only when Ms. Chaney asked Berry what the cost to repair number was that the Association objected because the Exhibit had not yet been introduced into evidence. Berry's counsel then took Exhibit 4 off the Elmo. At the Association's request, the preceding questions and answers regarding Exhibit 4 were stricken, and Berry ordered to "go ahead and lay the predicate" by the trial court.

| Plaintiff's Exhibit 4 | | III R.R. Page/Line |
|---|---|---|
| Ms. Chaney, Q: | I want to talk about your damages, Mr. Berry. | 115:16 |
| A. | Yes, ma'am. | 115:18 |
| Q: | Okay, Let's talk about Exhibit 4. It's a two-page document. Can you tell the jury what the first page of Exhibit 4 is? | 115:22 |
| A: | It's an estimate to do repairs on my boat. I had the boat taken out over to the marina and had a surveyor come over and do a survey on it. | 115:25 - 116:1-2 |
| Q: | Okay. And what -- what is the work that you are having estimated on here? | 116:3 |
| A: | Repair the bottom, prep and apply new barrier coat, sandblast the keel, reinstall the prop, and do other work, not including -- well, what this says is not including repairs to the keel or fiberglass repairs to the hull. | 116:5 |
| Q: | Okay. And the damage that is -- what is the repair amount in this document? | 116:10 |

| | | |
|---|---|---|
| A: | $12,491.06. | 116:12 |
| Mr. Oliveira: | Your Honor, I'm sorry. I'm going to object to this because it -- this appears to be some kind of invoice for something from somebody else, and it hasn't been admitted into evidence, Your Honor. I'd ask that it be taken down right now while we discuss this, please. | 116:13 |
| Mr. Oliveira: | This has not been admitted into evidence, Your Honor. I'm assuming it's some kind of invoice from a dealer or something -- | 116:20 |
| Ms. Chaney: | I've taken it down, Your Honor. | 116:23 |
| The Court: | All right. | 116:25 |
| Mr. Oliveira: | That hasn't been proven up. And so I would object to its admission or counsel discussing it. | 117:1 |
| The Court: | All right. | 117:4 |
| Ms. Chaney: | I'll ask the witness questions. | 117:5 |
| The Court: | All right. | 117:7 |
| Mr. Oliveira: | And I ask that any testimony from the invoice be stricken and that the jury be asked to disregard anything that was shown on the screen. | 117:8 |
| The Court: | All right. Just go ahead and disregard all the testimony up to this point. Strike it from the record. Go ahead and lay the predicate. | 117:12 |

29.     The Association's objection to Exhibit 4 was too late. Exhibit 4 had

already been put up on the Elmo for the jury to see, and several questions had been

asked of and answered by Berry before the Association objected to Berry's request

that it be admitted into evidence. The proper time to have made this objection

35

would have been before, or immediately after, Ms. Chaney put Exhibit 4 up on the Elmo. objection.

30.    Also, while the trial court did tell the jury to disregard all of the testimony up until that point, it did not instruction the jury to disregard what was shown on the Elmo. III R.R. 117:12.

31.    After Association's objection, Ms. Chaney asked Berry five more questions about Exhibit 4, to which he responded--with no objection from the Association:

| Plaintiff's Exhibit 4 | | III R.R. Page/Line |
|---|---|---|
| Ms. Chaney, Q: | Mr. Berry, what is Exhibit 4? | 117:16 |
| A: | Exhibit 4 is an estimate that I received from a boatyard to do repairs on my sailboat. | 117:17 |
| Q: | And where is this boatyard? | 117:19 |
| A: | This boatyard is in Aransas Pass, Texas. | 117:20 |
| Q: | Okay.  And what are the repairs that they are estimating be done on your boat? | 117:21 |
| Mr. Oliveira: | Your Honor, she's still getting into a document that hasn't been admitted into evidence.  I'm going to object until she gets -- properly lays the foundation that it's a business record. | 117:23 |
| The Court: | I'll sustain at this point. | 118:2 |

36

32. After a few more tentative starts by Berry's counsel, and with a little help from the judge as seen below, the court finally admitted Exhibit 4 into evidence. At this time, the Association again objected based on the hearsay objection, which the Court overruled.

| Plaintiff's Exhibit 4 | | III R.R. Page/Line |
|---|---|---|
| Ms. Chaney, Q: | Mr. Berry, where did you get this document? | 118:3 |
| A: | I got it in response to a survey that was done at my request at the boatyard in south -- in Port Isabel, Texas. | 118:5 |
| Q: | What do you mean a survey? | 118:8 |
| A: | I had the boat hauled out and cleaned and surveyed by a license inspector. And his report was given to me, and I gave that report to the local boatyard and also sent it up to Aransas Pass, another boatyard where he recommended that I take it for repairs, to get an estimate of the damage for this lawsuit. | 118:9 |
| Q: | And who was the individual that did your survey? | 118:15 |
| A: | Wes Thom, Wesley Thom. | 118:16 |
| Q: | And does the first page of Exhibit 4 represent the work that Mr. Thom was planning to do on your boat? | 118:17 |
| A: | Yes, it does. | 118:19 |
| Ms. Chaney: | Your Honor, I'd move to have Exhibit 4 admitted into evidence. | 118:21 |
| Mr. Oliveira: | And, Your Honor, I'm going to object because it's still hearsay. It hasn't been proven up as a business record. The proper way to do this was to submit it - | 118:23 |

37

| | - to either get somebody from the repair place to come and testify that this is their business record. He can't testify to that. I don't know where this came from. I mean, he could have -- I've never heard of these shops. I don't know if they're real shops. I don't -- we don't -- there's no authenticity. There's no way for me to cross-examine these folks. And she has not properly proven it up. It's either a business record or it's hearsay. It's hearsay, Your Honor. She hasn't proven it up. | |
|---|---|---|
| Ms. Chaney: | Your Honor, it was produced in discovery along with the identification of Mr. Thom and his boatyard. They had every opportunity to ask for their depositions or take their depositions, and they didn't do that. This is clearly proper evidence. | 119:12 |
| The Court: | Let me see it. | 119:17 |
| Mr. Oliveira: | And, Your Honor, the Court knows that just producing something in discovery doesn't make it admissible into evidence; and Ms. Chaney knows that, too, Your Honor. It has to have been -- it's a business record. It has to be proven up as a business record, and it hasn't been proven up. And unless somebody from the shop to prove it up at this point, it should not be admitted into evidence. The basic rule on hearsay evidence, Your Honor. | 119:18 |
| Ms. Chaney: | Your Honor, they were identified in discovery along with these records. | 120:2 |
| The Court: | So who was this sent to, or who requested it, or -- | 120:4 |
| Ms. Chaney: | We requested it to show the damage to Mr. Berry's boat. | 120:6 |
| The Court: | Who's "we," you or your client? | 120:8 |
| Ms. Chaney: | Mr. Berry took his boat out, had the survey done, had an estimate done on his boat.... | 120:9 |

38

| | | |
|---|---|---|
| The Court: | That's what I'm saying. This was mailed to him or -- | 120:14 |
| Ms. Chaney: | Yes | 120:16 |
| The Court: | He received it? | 120:17 |
| Ms. Chaney: | Yes | 120:18 |
| The Court: | Well, I don't think you covered that. . . you received that information, Mr. Berry? | 120:19 |
| A: | Yes, I did sir. | 120:22 |
| The Court: | Through the mail or fax or how did you get it? | 120:23 |
| A: | He actually gave it to me and I printed it. He emailed it to me, and I was there at the inspection myself. | 120:25 - 121:1-2 |
| The Court: | Okay. You were there at the inspection, and then he e-mailed you that information? | 121:3 |
| A: | Right. | 121:5 |
| The Court: | All right. I'll overrule the objection. Four will be admitted. | 121:6 |
| Mr. Oliveira: | Note my objection, Your Honor, <u>the hearsay objection</u> (emphasis added). | 121:9 |

33. Berry's counsel then went on to ask several more questions about the repair estimate without any further objection from Appellant's counsel:

| Plaintiff's Exhibit 4 | | III R.R. Page/Line |
|---|---|---|
| Ms. Chaney, Q: | What is the amount of repair that Mr. Thom is estimating it's going to cost to do this work? | 121:16 |

| A: | . . . I added it up. It didn't add it up here, but it's approximately $30,000. | 121:19 |
|---|---|---|
| Q: | . . . if you look at this number right here on exhibit 4, what is that? | 121:21 |
| A: | That's just to repair the bottom and sandblast the keel. | 121:23 |
| Q: | Okay. And what is that number? | 121:25 |
| A: | $12,491.06. | 122:1 |

34.    Thus, without any objection from Appellant's counsel, Mr. Berry was allowed to testify that the cost to repair estimate was for $12,491.06.

35.    Certainly, Association could have avoided this waiver by simply asking the Court for a running objection.  (Although an objection to evidence is made and overruled, it must be repeated if similar evidence is subsequently sought to be introduced, or the objection will be waived or the trial court's error will be deemed harmless. (See again, *Badger v. Symon*, 661 S.W.2d 163, 164-65 (Tex. App.—Houston [1 Dist.] 1983, writ st ref'd n.r.e.). Alternatively, the Association could have put the whole matter on the record outside the presence of the jury, so that the Association's counsel would not have to make repeated objections in front of the jury. Tex. Evid. Rule 103 (a) (2): "When the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is

40

admitted before the jury without the necessity of repeating those objections."

36. Instead, Association chose neither of these options, and as a consequence has waived the right to raise this issue on appeal.

EXHIBIT 5:

37. The same thing happened with Exhibit 5. Berry's attorney asked several questions about the document , and there were no objections until Ms. Chaney sought to move Exhibit 5 into evidence. At that time, Attorney Oliveira again objected based on hearsay:

| Plaintiff's Exhibit 5 | | III R.R. Page/Line |
|---|---|---|
| Ms. Chaney, Q: | Okay. And then Exhibit 5, do you have that in front of you? | 122:2 |
| A: | Yes, I do. | 122:4 |
| Q: | Is that an additional estimate from Mr. Thom? | 122:5 |
| A; | This is the estimate that Mr. Thom gave me, and he gave this to the South Padre boatyard and we sent this up to the Aransas Pass boatyard at his request. | 122:6 |
| Q: | So Mr. Thom handed this to you, Exhibit 5? | 122:9 |
| A: | No. He e-mailed it to me. | 122:10 |
| Q: | He emailed it to you. And were you present when he was doing this inspection? | 122:11 |
| A: | Yes, I was. . . And I was at his house when we went over it, so -- | 122:13, 15-16 |
| Ms. Chaney: | Your Honor, I'd move to have Exhibit 5 admitted into evidence. | 122:17 |

41

| | | |
|---|---|---|
| Mr. Oliveira: | Your Honor, same objection that it's a business record. We have no way of cross-examining these folks, and she should have submitted it as a business record. I think <u>this is improper hearsay</u> . . . . it's hearsay and there's no authenticity. (Emphasis added.) | 122:19 |

After the Court overruled Association's objection to Exhibit 5, Berry's counsel (just like with Exhibit 4) questioned Berry further about the exhibit, with no objection from the Association:

| Plaintiff's Exhibit 5 | | III R.R. Page/Line |
|---|---|---|
| Ms. Chaney, Q: | In Exhibit 5, Mr. Berry, what are they estimating -- or what is the work that they're estimating needs to be done? | 123:11 |
| A: | It would be best for me just to read it since they didn't itemize it.<br><br>. . .<br><br>"The fiberglass portion of the hull was not in bad shape considering the time and shallows. But the metal keel was badly pitted from electrolysis, and the propeller also shows signs of severe electrolysis. The keel will have to be sandblasted to remove what covering is still left. But based on what I see at this time, I would expect seven to $10,000. The propeller replacement about four -- seven to $800. Then zincs should be installed. Remove all bottom paint, apply barrier costs and bottom paint, I would expect five to 6,000.<br><br>"When the boat is out for repairs, I would want the boat to sit out, bottom clean and drying for 90 to 120 days just drying out the hull, checking for blisters. The keel work and the cleaning, compounding and waxing of the | 123:14-25, 124:1 |

42

| | | |
|---|---|---|
| | hull above the water line could be done." | |
| Q: | So if you add up all those numbers, they range from a low … 13,700 to a high of $16,800? | 124:7 |
| A; | I don't have a calculator, but -- | 124:10 |
| Q: | Well, the jury will get this document and they can add it. | 124:11 |

38. Following the above testimony, Berry proceeded to testify regarding how the damage that is referenced in Exhibits 4 and 5 was caused -- again, without any objection from Appellant's counsel (III R.R. 124:14-15, 125:1-5) thereby "curing" the error in admission, if any. See, *Vasquez v. State*, 2008 Tex. App. LEXIS 2952 (Tex. App. Corpus Christi Apr. 24, 2008). "It is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection; defense counsel must object every time allegedly inadmissible evidence is offered. General application of this rule has not proven to be burdensome for defense counsel in many cases."

39. In addition to Berry's testimony curing the error in admission, if any, Association also objected to the introduction of Exhibits 4 and 5 based on "improper hearsay." (Page 15 of the Association's Appellate Brief, Section II, "Judgment Notwithstanding the Verdict, New Trial;" III R.R. 121:9 and 122:19.)

Generally, hearsay is not admissible unless there is an exception. Tex. R. Evid. 802. Upon request of a party, a trial court may exclude

43

evidence, such as hearsay. However, the trial judge has no duty to exclude hearsay on his own, and once admitted without objection, such evidence enjoys a status equal to that of all other admissible evidence. In particular it has probative value and will support a judgment in favor of the party offering it. Under Tex. R. Evid. 802, inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay. The court reviews the trial court's admission of evidence, including hearsay, under an abuse of discretion standard. *Vasquez v. State*, 2008 Tex. App. LEXIS 2952, 1 (Tex. App. Corpus Christi Apr. 24, 2008)

      b.    <u>Any Error by Admitting Berry's Exhibits 4 and 5 Was Harmless Because the Exhibits Were Cumulative of Berry's Oral Testimony to Which the Association Did Not Object.</u>

40.    Even if the trial court made an error in allowing Exhibits 4 and 5 to be admitted into evidence, the error was harmless and does not warrant reversal. The error is harmless for two reasons. First, given the amount of testimony the Association allowed Berry to render regarding Exhibits 4 and 5 <u>without raising any objections</u> (see above testimony of Berry), the jury had sufficient evidence before them to consider the issue of Berry's request for monetary damages without relying on Exhibits 4 and 5.

41.    Second, the cost to repair number in Exhibits 4 and 5 was almost $30,000 (122:1-$12,491.06 and 124:7-$16,800-$13,700); and yet the jury awarded Berry only $17,000. Therefore, it cannot be said with assurance that the jury's decision was even based on Exhibits 4 and 5, versus Berry's "unobjected to" testimony regarding his damages.

"If the same or similar evidence is admitted without objection at another point in the trial, the error is harmless." *Chapman v. State*, 150 S.W.3d 809, 814 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).

42.     Based on all of the foregoing arguments in this Section II, "A," Association has waived its right to appeal the jury's award to Berry of $17,000 for the cost to repair his sailboat.

### B. Evidence of the Decrease in the Value of Berry's Residence was Properly Admissible and Considered by the Jury

43.     Association argues that the trial court erred in denying the Association's motion for judgment notwithstanding the verdict with regard to the $5,000.00 damages award for the decrease in value of the Berry residence. (C.R.476). Association complains that the only evidence in support of these damages was the testimony of Berry himself. Without providing any legal authorities whatsoever, Association provides this Court only with the conclusory statement that "the jury's award of $5,000 damages to Berry's residence is unsupported by the evidence, is against the great weight and preponderance of the evidence, and is unreasonable, and thus the court erred in not entering judgment notwithstanding the verdict or granting new trial." (Applnt. Brf at 16, ¶ 6).

44.     Again, the same waiver argument applies here as with the directed verdict argument. "Rule 38 requires [a party] to provide us with such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at

45

issue." *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). "This is not done by merely uttering brief conclusory statements, unsupported by legal citations." *Id.* "Issues on appeal are waived if an Appellant fails to support his contention by citations to appropriate authority . . . ." *Abdelnour v. Mid Nat'l Holdings, Inc.*, 190 S.W.3d 237, 241 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Similarly, as this Court is well aware appellate issues are waived when the brief fails to contain a clear argument for the contentions made. *Izen v. Comm'n for Lawyer Discipline*, 322 S.W.3d 308, 322 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). By again failing to provide legal authorities in support of its argument, Association waived this argument and failed to comply with its briefing requirements to this Court. Therefore, the argument should be denied.

45. Even if this Court wanted to entertain Association's assertions, Berry nevertheless prevails on this issue as a matter of law. Under Texas law, any witness (including the property owner) may testify regarding market value, so long as the witness is competent to testify about the subject. The witness must establish that he or she has knowledge of the market value of the item in question, and that such knowledge is based upon some degree of personal observation. *Bavarian Auto Haus, Inc. v. Holland*, 570 S.W.2d 110 (Tex. Civ. App. – Houston [1st] 1978,

46

no writ). Testimony regarding market value must be of value of the property at the time it was damaged or destroyed, not the value at the time of trial.

46.     Further, the opinion testimony regarding market value may be given by the owner of the property.   For example, an owner of an automobile may testify as to the vehicle's market value. *Coleman v. Gourmet*, 59 S.W.2d 550 (Tex. App. – Houston [14th] 1993, writ dismissed). However, the owner's opinion testimony as to the value of the property must refer to market value, rather than the property's intrinsic or sentimental value to the owner.

47.     Here, Berry's testimony falls directly within these legally mandated boundaries for establishing diminution in value.  Specifically, Berry testified that:

> a.  he has seen tax statements covering his property, which set forth property values of the subject lot and the house;
>
> b.  the purchase price in 2005 was $106,000; and,
>
> c.  the latest tax statement valued his house and land at $96,000.

(III R.R.129:14-131:9).  Nowhere did the Association offer contradictory evidence. The jury took the information properly before it and concluded Berry was entitled to compensation of $10,000 for diminution in value.

48.     In the light of the legal authorities set forth above and the evidence presented by Berry, Association's argument is without merit and judgment in favor of Berry on the diminution in value of his residence must be affirmed.

47

## C. <u>Berry Properly Established the Value of the Loss of Use and Enjoyment of his Property.</u>

49. Association next complains that the jury's award of $75,000 for Berry's loss of use and enjoyment of his property was not supported in the record, "was against the great weight and preponderance of the evidence, and is unreasonable". (Applnt Brf., p. 16, ¶ 7). Again, Association offers no legal authorities in support of its argument; thus it has once again waived this argument. "Rule 38 requires [a party] to provide us with such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue." *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). "This is not done by merely uttering brief conclusory statements, unsupported by legal citations." *Id.* "Issues on appeal are waived if an Association fails to support his contention by citations to appropriate authority . . . ." *Abdelnour v. Mid Nat'l Holdings, Inc.*, 190 S.W.3d 237, 241 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Similarly, as this Court is well aware appellate issues are waived when the brief fails to contain a clear argument for the contentions made. *Izen v. Comm'n for Lawyer Discipline*, 322 S.W.3d 308, 322 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). By again failing to provide legal authorities in support of its argument, Association waived this argument and failed to comply with its briefing requirements to this Court. Therefore, the argument should be denied. Association's brief amounts to nothing

48

more than debating the jury's analysis of the evidence introduced at trial by Association and criticizing Berry's testimony in support of the jury's $75,000 award for loss of use.

50. To prove loss of use damages in Texas, the Plaintiff must provide evidence of (1) the reasonable rental value of the substitute item; and (2) the time period in which the Plaintiff was deprived of using the damaged item. *Kollision King v. Calderon*, 968 S.W.2d 20 (Tex. App. – Corpus Christi 1998, no pet.).

51. Berry provided the trial court and jury with detailed testimony regarding loss of use. His testimony included his personal experience with use of similar ocean-worthy sail boats and the cost of rental of replacement watercraft (III R.R. 127:14-17); the fact that he had not been able to sail since 2009 (III R.R. 129:12-13); and, that he was seeking recovery for the loss of use he sustained as a direct result of Association failing to maintain and dredge the canals to an appropriate depth. (III R.R. 133:17-18).

52. Thus, Berry established both elements required for proving loss of use of his own sailboat: the reasonable rental value and the time period during which he was deprived of using his sailboat. Association's argument in favor of a new trial or judgment notwithstanding the verdict is without merit and should be denied.

**D. Berry's Testimony In Support of his Mental Anguish Claim Satisfies the Texas Requirements for Recovery of Such Damages**

49

53. The Association next complains that the mental anguish damages awarded to Berry were not supported by the evidence. However, other than citing to the seminal case of *Parkway* on this issue, Association offers no authorities in support of its conclusory statements.

54. In Texas, non-physical injury cases have a very specific, well-established standard for the recovery of damages for mental anguish. In *Parkway Company v. Woodruff*, 901 S.W.2d 434 (Tex. 1995), the Texas Supreme Court laid the initial foundation for the recovery of such damages in a non-personal injury case. In *Parkway*, suit was brought by a homeowner against a contractor for flood damage. Woodruff's home flooded and was damaged due to the negligence of the defendant contractor building the home in the flood plain. The Woodruffs sued and recovered for their mental anguish resulting from the flooding of their home. The Court in *Parkway* set the following standard for recovery of mental anguish damages in cases not involving physical injury: Plaintiffs may recover when they "have introduced direct evidence of the nature, duration and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Parkway*, 901 S.W.2d at 444. The Court called for close judicial scrutiny of the plaintiffs' evidence, and that "mere emotions" did not rise to the legal of compensable mental anguish. *Id.* What *did* satisfy the standard, however, were situations where some physical manifestation or expression of mental anguish exists, such as "throwing up" or becoming "physically ill". *See, e.g., Latham v. Castillo,* 972 S.W.2d 66, 70 (Tex. 1998)

In this case, Berry testified that the Association's actions and inactions:

A. Caused him a lot of anguish (III R.R. 131:11)

B. Caused heart angina requiring treatment, and that he was still being treated for it (III R.R. 131:11-19)

C. He had to seek treatment for depression, and that he was still being treated for it; and, a worsening of pre-existing depression "over the years" requiring a change of his medication (III R.R. 131:10-132:22). No expert or other testimony was offered to substantiate Berry's damages. (III. R.R.115:16-134:2), but as a matter of law in Texas no such expert testimony was required.

Thus, more than "mere emotions", Berry additionally established to the Court physical manefestations of his anguish. Despite what appeared to be an obvious bias in favor of physical symptoms, after *Latham,* the Texas Supreme Court actually "eliminated this ' physical manefestation' requirement after concluding that physical symptoms are not an accurate indicator of genuine mental anguish." *See City of Tyler v. Likes,* 962 S.W.2d 489, 495 (Tex. 1997), citing *Boyles v. Kerr,* 885 S.W.2d 593, 598 (Tex. 1993); *St. Elizabeth Hosp. v. Garrard,* 730 S.W.2d 649, 650 (Tex. 1987), *overruled on other grounds by Boyles,* 885 S.W.2d 593. Yet Berry's unchallenged proof at trial met even this previously heightened standard. The jury's assessment of the value of the harm sustained by Berry through mental anguish should not be disturbed on appeal.

51

## III. BERRY AS A PROPERTY OWNER HAD STANDING TO SUE

55.    Association next argues that the trial court erred in denying its motion to dismiss for lack of jurisdiction because Berry, as an individual property owner, lacked standing to sue. (C.R. 420-424). Association argues "in a suit to recover for injury to land owned in common, all tenants must join. *Id.* (citing *Gulf., C. & S.F. Ry. Co. v. Cusenberry,* 26 S.W. 43, 45 (1894) and other authorities). Association goes on to argue that recovery for damages to common areas belongs solely to the homeowner's association; the unit owners have no individual property right in the common areas. (Association's Brief at 18-19). Instead, Association argues that only the Association has that standing. This is a misstatement of the law.

56.    In *Brooks v. Northglen Association,* 141 S.W.3d 158 (Tex. 2004), the Texas Supreme Court established the controlling law on this issue.    In *Brooks,* the homeowner's association alleged that the trial court lacked subject matter jurisdiction because the property owners, who were challenging, via a declaratory judgment action, the association's attempt to increase annual assessments and impose late fees. The HOA argued that all the property owners were required to be joined before the court could render a declaratory judgment and that, alternatively, the court was without jurisdiction because property owners in each of the affected sections were not represented.

57.    The Court held that a declaratory judgment action against property owners' association would not prejudice the rights of other property owners because un-joined owners would not be bound by the suit, noting that nothing prevented the trial court from rendering complete relief to those parties before it, and if the homeowners' association

52

were exposed to multiple suits, that was the result of its own inaction. *Id.* at 163. *See also Jones v. Smith*, 157 S.W.3d 517 (Tx. Ct. App. – Texarkana 2005).

58. The Court reasoned that Rule 39 of the Texas Declaratory Judgment Act determines whether a trial court has authority to proceed without joining a person whose presence in the litigation is mandatory. *Id.* at 162. However, § 37.006(a) of the Declaratory Judgment Act, which provides that a trial court's declaration does not prejudice the rights of any person not a party to the proceeding, dispenses with any concern that all owners must be joined. *See* Tex. Civ. Prac. & Rem. Code § 37.006(a). "[I]t would be rare indeed if there were a person whose presence was so indispensable in the sense that his absence deprives a court of jurisdiction." *See Cooper v. Tex. Gulf Indus., Inc.*, 513 S.W.2d 200, 204 (Tex. 1974).

59. Accordingly, the Association's argument is without merit and must be disregarded. The trial court properly denied the Association's motion to dismiss on the basis of standing. To hold otherwise would subject property owners such as Berry to a high burden of adding hundreds, if not thousands, of other property owners in a subdivision merely to enforce rights and privileges of the party property owner.

## IV. ATTORNEY FEES WERE PROPERLY AWARDED GIVEN THE INEXTRICABLE NATURE IN WHICH THE CLAIMS WERE INTERTWINED. BERRY CONCEDES THAT IF THIS COURT DISAGREES, THE CASE SHOULD BE REMANDED FOR FURTHER EVIDENCE REGARDING THE PERCENTAGE OF TIME BERRY'S COUNSEL DEVOTED TO EACH CLAIM ASSERTED

60.     Recovery of attorneys' fees under Texas law turns upon whether contractual or statutory authorization exists for such fees. *Gulf State Utils. Co. v. Low*, 79 S.W.3d 561, 567 (Tex. 2002). The Texas Civil Practice and Remedies Code permits prevailing parties to recover their attorneys' fees in breach of contract actions. TEX. CIV. PRAC. & REM. CODE § 38.001(8) (Vernon 1997 & Supp. 2005). Section 37.009 also permits recovery of attorney fees for a declaratory judgment claim. Here, Berry sought recovery of his attorneys' fees incurred in connection with its breach of contract and declaratory judgment claims against Association. Berry may also recoup fees incurred as a result of his legal work on other (unrecoverable) claims to the extent that its work on these other claims was "so intertwined" with its efforts on the recoverable claim (the breach of contract and declaratory judgment claims) that it advanced both claims. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006)

61.     A party seeking attorneys' fees has a duty to segregate nonrecoverable fees from recoverable fees. *Id.* at 311. In 1991, the Supreme Court of Texas in *Stewart Title Co. v. Sterling*, 822 S.W.2d 1 (Tex. 1991) recognized an exception to this duty to segregate:

> "A recognized exception to this duty to segregate arises when the attorney's services rendered are in connection with claims arising out of the same transaction and are so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.' Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are

54

'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims."

*Id.* (quoting *Sterling*, 822 S.W.2d at 11-12) (other citations omitted). The Supreme Court of Texas revisited the *Sterling* exception and modified it as follows:

> Accordingly, we reaffirm the rule that if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated. We modify *Sterling* to that extent.

*Chapa,* at 313-14.

62. Berry was awarded $75,000 in attorneys fees (and $7,500 in the event of appeal, and an additional $5,000 in the event of further appeal to the Supreme Court of Texas). In support of its award of attorney fees, Berry submitted an affidavit of its attorney Lecia Chaney ("Chaney") setting forth the basis of such fees, her years of experience, hourly rate, and a detailed explanation of the claims asserted and the fact that they were inextricably intertwined. She segregated time expended on slander claims and excluded those from her request since they arose instead from a separate and discrete set of facts. (Association's App. Exh. B). The fee request also did not include fees incurred on appeal.

63. In its Brief, Association complains that fees were recoverable on two of Berry's five claims (breach of contract and declaratory judgment) and therefore that the fees should be proportionately reduced by 60%. Association does not

55

provide any analysis of the work involved in each of the claims or even address the fact that all of these claims entailed the same amount of time and effort to assert and prosecute – a fact established by the Chaney affidavit.

64. While trial courts have discretion in fashioning the appropriate amount of attorneys' fees, their decision as to whether and how to segregate fees is a determination subject to de novo review on appeal. *See Chapa*, 212 S.W.3d at 312.

65. As *Chapa* recognizes, allocating attorneys' fees is not a precise science: But *Sterling* was certainly correct that many if not most legal fees in such cases cannot and need not be precisely allocated to one claim or the other. Many of the services involved in preparing a contract or DTPA claim for trial must still be incurred if tort claims are appended to it; adding the latter claims does not render the former services unrecoverable. Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, voir dire of the jury, and a host of other services may be necessary whether a claim is filed alone or with others. To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service. *Chapa*, 212 S.W.3d at 313. The Court in *Chapa* went on to provide guidance regarding what type of proof is (and is not) required for attorneys' fees: This standard does not require more precise proof for attorney's

fees than for any other claims or expenses. In *Chapa* the attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of her petition; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim. *Id.* at 314.

66. Notably, Association did not submit an opposing affidavit in response to the Chaney affidavit. It merely argues now something similar to a "pro-rata" reduction of fees argument, summarily asserting that if there are 5 claims, and you can recover attorney fees on 2 of them (or 40% of the claims), then the total fees should be reduced by 60%. Association cites no legal authorities in support of this formula, as none exist.

67. This Court may be well advised to conduct an exhaustive review of the record of this case, the extent of all briefing submitted, and observe the overlapping nature of Berry's claims before settling on the final attorney's fees award. The Court should specifically consider whether work on the non-recoverable claims "tended to prove" the breach of contract and the declaratory judgment claims - a key factor in *Chapa*. This, in addition to the trial court's first-hand knowledge of the legal work on the case, supports not disturbing the original award. The evidence at trial alone established the interrelatedness of the claims at issue here. A cursory review of the opening statements and closing arguments at

57

trial reveals that evidence of the breach of contract claim advanced the other claims and vice versa. In fact, even Association in its Appellants' Brief never articulated different standards or different evidence regarding the breach of contract claim vs. the negligence claim. Further, the high quality of the legal work on both sides of the case was clear to the trial court throughout the proceedings - both in-court and in the briefing. The case was exceptionally hard-fought, and the issues were novel.

68. This Court is respectfully asked to uphold the trial court's award of attorney fees. In the alternative, however, if this Court determines that it does not have sufficient evidence to support the fee award, then the Court must remand the case for further proceedings to enable Berry to present additional evidence with regard to the intertwined nature of the claims as well as evidence of the percentages of time expended on each recoverable claim.

## V. THE EVIDENCE SUPPORTED THE COURT'S DECLARATORY JUDGMENT THAT THE ASSOCIATION HAS A DUTY TO DREDGE THE CANALS TO FIVE (5) FEET BELOW MEAN TIDE.

69. Finally, Association challenges the trial court's declaratory judgment requiring Association to dredge the canals to a depth of six-and-a-half feet. In support of its argument, Association adopts *verbatim* the same arguments and legal authorities set forth in support of its argument in favor of new trial or judgment notwithstanding the verdict on Berry's breach of contract claims. (*Compare*

58

*Applnt's Brf., pp. 24-26 with pp. 11-12).* In response, Berry similarly adopts his arguments set forth herein at pages 27-50 under section II. In summary, Association's arguments are without merit, and his challenge to the declaratory judgment award falls short of the proof required for challenges to the sufficiency of evidence. *See,* pp. 27-50, *supra,* and the legal authorities cited therein, which are incorporated herein by this reference.

## VI.   CONCLUSION

The Association's attack on the trial court's judgment below falls far short of the arguments and  legal authorities necessary to overturn the trial court's jury verdict and resulting judgment below.  This case was well-developed; the proof presented to the jury was comprehensive; and at the end of the day the jury resolved all of the open issues, save only the declaratory judgment which fell within the purview of the judge.

Berry prays that this Court will affirm the judgment of the trial court; award Berry his attorney fees and costs incurred on appeal against Association, and for such other and further relief as may in the premises be just and equitable.

Respectfully submitted,

THE LEFLER LAW FIRM
501 South Austin Avenue, Suite 1245
Georgetown, Texas 78626
T  (512) 863-5658
F  (866) 583-7294


SANDRA M. LEFLER
Texas State Bar No. 12161040
slefler@leflerlegal.com

LEAD COUNSEL FOR APPELLEE

## PROOF OF SERVICE

This is to certify that on February 6, 2015, Appellee served Appellants with a true and correct copy of the foregoing Answer Brief via ECF service to:

David G. Oliveira
Roerig, Oliveira & Fisher, LLP
10225 North Tenth Street
McAllen, TX 78504
Fax: 956-386-1625
doliveira@rofllp.com

Lead Counsel for Appellants


Lecia Chaney
COLVIN, CHANEY, SAENZ & RODRIGUEZ
1201 E. Van Buren St.
Brownsville, Texas 78522
T (956) 295-3070
F (956) 541-2170
Counsel for Appellee


_____
SANDRA M. LEFLER

61

## CERTIFICATE OF COMPLIANCE

I certify that this document was produced on a computer using Microsoft Word 2010 and contains 14,227 words as determined by the computer software wordcount function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(1).

SANDRA M. LEFFLER

# VII. APPENDIX

Exhibit A:    March 2005 Restatement of Declaration of Covenants, Conditions and
Restrictions (P's Exh. 1)

# EXHIBIT A

# MARCH 2005 RESTATEMENT OF THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS
## FOR LONG ISLAND VILLAGE, A CONDOMINIUM
*(formerly known as OUTDOOR RESORTS/SOUTH PADRE, A CONDOMINIUM)*

THE STATE OF TEXAS     §

COUNTY OF CAMERON     §

KNOW ALL MEN BY THESE PRESENTS: That this March 2005 Restatement of the Declaration of Covenants, Conditions and Restrictions For Long Island Village, a Condominium (formerly known as Outdoor Resorts/South Padre, a Condominium) ("March 2005 Restatement"), is made on the date hereinafter set forth by **LONG ISLAND VILLAGE OWNERS ASSOCIATION, INC. (the "Association")** a non-profit Texas corporation previously known as Outdoor Resorts/South Padre Owner's Association, Inc. regarding the following · real property:

> **The real property described in Volume 14, Pages 691-705, and in Volume 5271, page 53, of the Official Records, Cameron County, Texas**

to supercede in their entireties those certain instruments recorded in the Official Records, Cameron County, Texas as

(1) Document #00054483 in Volume 10604, Page 49-69 (the "Corrected Declaration Restatement"),

(2) Document #00041531 in Volume 10392, Page 118-138 (the "Original Restated Declaration"), and

(3) the Declaration of Covenants, Conditions and Restrictions for Outdoor Resorts/South Padre, a Condominium, dated March 3, 1982, and recorded in Volume 14, Page 673-721 (the original "Outdoor Resorts/South Padre Declaration"), as the same was thereafter amended from time to time.

## WITNESSETH:

WHEREAS a joint venture comprised of Outdoor Resorts of Texas, Inc. (a Texas corporation) and Fiesta Harbor, Inc. (a Texas corporation), hereinafter referred to as the "Developer," recorded a Declaration of Covenants, Conditions and Restrictions for Outdoor Resorts/South



Doc 00018690 Bk OR 11201 Vol 120 Pg

Padre, a Condominium, and Exhibits A, B and C thereto, dated on or about March 3, 1982, in Volume 14, Page 673-721, of the Official Records, Cameron County, Texas (the "Outdoor Resorts/South Padre Declaration"); and

WHEREAS under the Outdoor Resorts/South Padre Declaration, the Developer subjected certain lots described in Exhibit "B" thereto, in which Developer held certain leasehold interests, to a Condominium regime, and corrected, clarified and superceded all previously filed Declarations of covenants, conditions and restrictions and Exhibits thereto, consisting of plats covering Phases I through IV inclusive, that had been theretofore sequentially filed for record in the Office of the County Clerk, Cameron County, Texas, in Volume 6, Pages 645-700, Volume 7, Pages 735-848, Volume 8, Pages 35-110, Volume 8, Pages 663-682, Volume 10, Pages 1-76, Volume 13, Pages 65-113;

WHEREAS certain changes have occurred since the Outdoor Resorts/South Padre Declaration was filed, as follows:

1. The Association acquired the fee interests to the real property comprising the Condominium Common Elements, including the check-in area that was previously owned by the Developer; and

2. Certain of the owners of individual units of leasehold interests subjected to the Condominium regime acquired the fee interests to the real property underlying those leasehold interests; and

3. In addition to Phases I through IV of the condominium development that were platted, the Developer contemplated Phases V through VII of the condominium development (the "Contemplated Development) that never occurred, changing the number of Units in the condominium development. The Texas corporations that comprised the joint venture Developer, Outdoor Resorts of Texas, Inc. and Fiesta Harbor, Inc., forfeited their respective corporate charters on February 11, 2000, and February 15, 1994, respectively. Certain of the rights reserved or applicable to the Developer in the Outdoor Resorts/South Padre Declaration have expired, or are thus no longer applicable, while other reserved rights were acquired by the Association under an amendment to the Declaration adopted March 7, 1998, recorded in Volume 5271, Pages 51-54 of the Official Records, Cameron County, Texas; and

4. The members of the Association amended the Outdoor Resorts/South Padre Declaration in the following amendments recorded in the Official Records of Cameron County, Texas:

2

Doc 00018690 Bk OR 11201 Vol 121 Pg

(a) amendment adopted March 1, 1989, recorded in Volume 754, Page 183-187;

(b) amendment adopted March 28, 1991, recorded in Volume 1587, Page 22-32;

(c) amendment adopted March 7, 1998, recorded in Volume 5271, Pages 51-54, and which added certain additional real property to the Common Elements;

5.     The Association or its Board of Directors have, at various times, amended the Bylaws for the Association, or the initial Rules and Regulations for the Association (originally recorded as Article XVII of the Bylaws and which Bylaws were Exhibit G to the Outdoor Resorts/South Padre Declaration), and which amendments are reflected in documents recorded in the Official Records of Cameron County, many of which amendments were superceded by subsequent amendments;

6.     The Association amended its name to "Long Island Village Owners Association, Inc." and the name of the Condominium regime to "Long Island Village."

7.     The Outdoor Resorts/South Padre Declaration in various provisions references "campsites" instead of "Units" or "lots." The term "campsites" is not defined in the Outdoor Resorts/South Padre Declaration, and none of the Condominium Units or lots has the appearance of what is commonly understood as a "campsite" (as opposed to a lot with a pad).

8.     The number of Units in the Condominium is actually 1024, rather than the 2000 units referenced in the Outdoor Resorts/South Padre Declaration;

9.     Because it does not have an insurable interest in the individual units, the Association is unable to obtain certain insurance as suggested or implied by the Insurance Provisions in Article VIII of the Outdoor Resorts/South Padre Declaration, requiring a re-wording of the Association's obligations in Article VIII; and

10.     The Texas statutes applicable to this Condominium have been re-codified and amended.

(collectively the "Changes"); and

WHEREAS Section 82.053 of Chapter 82 of the Texas Property Code, applicable to this Condominium regime as set forth in Chapter 81

3

of the Condominium Act, provides that the provisions of the declaration and bylaws are severable; and

WHEREAS the Association seeks to restate the Outdoor Resorts/South Padre Declaration in order to sever the declaration and the bylaws in accordance with Section 82.053, and to additionally clarify the declaration and bylaws to reflect the Changes, including:

1. To eliminate the reference to leasehold interests in the Common Elements, to which the Association now holds a fee interest;

2. To eliminate the reference to leasehold interests regarding Units, as most of the Owners of Units hold the fee interest to the real property;

3. To eliminate references (a) to Phases V through VII of the Contemplated Development that were never developed, (b) to a Developer that no longer exists, and (c) to rights reserved to the Developer that are no longer applicable; and to substitute the Association with references to the Rental Rights acquired by the Association from the Developer under the March 7, 1998 Amendment;

4. To eliminate the confusion created by piecemeal amendments to the Declaration and Bylaws recorded in the Official Records of Cameron County, Texas, by restating in their entirety (a) in one document the Declaration as amended, and (b) in another document the Bylaws as amended;

5. To eliminate the confusion created by piecemeal and superseded amendments to the Rules and Regulations (Article XVII of the Bylaws) by separating the Rules and Regulations from the Bylaws, and restating in their entirety, in one document, the Rules and Regulations as currently amended;

6. To change references to the Association and the condominium regime to reflect the current names;

7. To substitute the defined term "Unit" or "lots" for the word "campsite(s)";

8. To reflect the correct number of Units actually existing in the Condominium;

9. To reflect Insurance Provisions in Article VIII as restricted to

4

property in which the Association has an insurable interest for which it can obtain insurance;

10.  To reflect and correct references to Texas statutes as re-codified and amended; and

11.  To correct certain typographical errors in the Outdoor Resorts/South Padre Declaration;

and

~~WHEREAS the Association seeks to restate the Corrected~~ Declaration Restatement (Document #00054483 in Volume 10604, Page 49-69), and the Original Restated Declaration (Document #00041531 in Volume 10392, Page 118-138) filed in the Official Records of Cameron County, to correct certain errors inadvertantly made in restating the Outdoor Resorts/South Padre Declaration therein;

**NOW THEREFORE, IN CONSIDERATION OF THE FOREGOING**, the Association restates the Declaration of Covenants, Conditions and Restrictions for Long Island Village as follows:

Definitions:

As used in this Declaration of Condominium and the By-Laws and Rules and Regulations referenced herein, and all amendments thereto, unless the context otherwise requires, the following definitions shall prevail:

A.  Declaration, or Declaration of Condominium, or Enabling Declaration, means this instrument, as it may, from time to time, be amended.

B.  Association or Corporation means **LONG ISLAND VILLAGE OWNERS ASSOCIATION, INC.**, a nonprofit Texas corporation, and its successors, being the entity responsible for the operation of the Condominium.

C.  By-Laws means the By-Laws of Long Island Owners Association, Inc., as they exist from time to time.

D.  Common Elements means the portions of the Condominium Property not included in the Units and shall include any premises leased by the Association.

March 2005 Restated Declaration

Doc 00018690 Bk OR 11201 Vol 124 Pg

E. Limited Common Elements means, and includes those Common Elements which are reserved for only limited use by the Association or certain Unit Owners.

F. Condominium means that form of ownership of Condominium Property under which units or improvements are subject to ownership by different owners, and there is appurtenant to each unit as part thereof, an undivided share in the common elements.

G. Condominium Act means, and refers to, the Condominium Act of the State of Texas, Chapter 81, Texas Property Code, as same may be amended from time to time.

H. Common Expenses means the expenses for which the Unit Owners are liable to the Association.

I. Common Surplus means the excess of all receipts of the Association, including, but not limited to, Assessments, rent and revenues on account of Common Elements, over the amount of Common Expense.

J. Condominium Property means, and includes, the land in a Condominium whether or not contiguous, and all improvements thereof, and all easements and rights thereto, intended for use in connection with the Condominium.

K. Assessment means a share of the funds required for the payment of Common Expenses which, from time to time, is assessed against the Unit Owner.

L. Condominium Parcel means a Unit, together with the undivided share of Common Elements, which is appurtenant to the Unit.

M. Condominium Unit, or Unit, means a part of the Condominium Property which is subject to private ownership.

N. Unit Owner, or Owner of a Unit, or Parcel Owner, means the owner of a Condominium Parcel.

O. Village means the lots and Common Elements subjected to the Condominium regime now known as Long Island Village.

P. Institutional Mortgagee means a bank, savings and loan association, finance company, insurance company, or union pension fund, authorized to do business in the State of Texas, or any agency or the United States Government.

6

Doc 0000186690 Bk OR 11201 Vol 1 125 Pg

Q. Voting Member means that person designated to vote where a Unit is owned by two or more parties or by a corporation.

R. Occupant means person or persons, other than the Unit Owner, in possession of a Unit.

S. Condominium Documents means this Declaration, the By-Laws, the Regulations, and all Exhibits annexed thereto as the same, from time to time, may be amended.

T. Unless the context otherwise requires, all other terms used in this Declaration shall be assumed to have the meaning attributed to said term in the Condominium Act of the State Texas, Chapter 81, Texas Property Code, as amended.

## ARTICLE I.
## OWNERS ASSOCIATION AND VOTING RIGHTS

The Condominium shall be governed by an owners' association. It shall be known as **LONG ISLAND VILLAGE OWNERS ASSOCIATION, INC.**

The Association shall have one class of voting membership which shall consist of all Condominium owners. Such owners shall be entitled to one vote for each Condominium Unit in which they hold an interest. When more than one person holds such interest in a Condominium Unit, the vote for such Condominium Unit shall be exercised as they among themselves determine. In no event shall more than one vote be cast with respect to any Condominium Unit. Every record owner of a Condominium Unit which is a part of the property which is or may become subject by covenant of record to assessment by the Association shall be a member of the Association, provided, however, there shall be only one Voting Member. Ownership of a Condominium Unit shall be the sole qualification for membership.

The foregoing is not intended to include anyone who holds an interest merely as security for the performance or an obligation.

## ARTICLE II.
## OWNERSHIP OF COMMON ELEMENTS

Each of the Unit Owners shall hold an undivided 1/1024 interest or greater pro rata share in the common elements and limited common elements.

7

March 2005 Restated Declaration

The interest to each Condominium Parcel shall include both the Condominium Unit and the above respective undivided interest in the Common Elements to be deemed to be conveyed or encumbered with its respective Condominium Unit even though the description in the instrument of conveyance or encumbrance may refer only to the real property interest or to the Condominium Unit. Any attempt to separate the real property interest to a Condominium Unit from the undivided interest in the Common Elements appurtenant to each Unit shall be null and void. The term "Common Elements," when used throughout this Declaration shall mean both Common Elements and Limited Common Elements, unless the context otherwise specifically provides or requires.

These Common Elements include, but are not limited to the following: The roads within the Condominium property, all pathways as shown on the subdivision plat, bathhouses, recreational facilities in the recreation area, service facilities located in the common use areas, parks, parking areas, and other areas which are for common benefit and enjoyment of the owners of the lots, including the check-in area that was acquired by the Association from the Developer.

Canals or channels, up to but not including bulkheads, are included as Limited Common Elements for use by the owners of lots abutting the canals or channels including space for boat docks built in compliance with standards established by the Association.

### ARTICLE III.
### COMMON EXPENSES AND COMMON SURPLUS

The Common Expenses of the Condominium shall include, among other items set forth herein, the maintenance and operation of the Common Elements. Each Unit Owner shall be responsible and liable for an equal share of the Common Expenses, regardless of the purchase price of the Unit, its location or square footage of the same.

Any Common Surplus of the Association shall be owned by each Unit Owner in the same proportion as the Unit Owner's contributions to the Common Expenses as the Assessments of the Association.

### ARTICLE IV.
### METHOD OF AMENDMENT OF DECLARATION

This Declaration may be amended at any regular or special meeting of the Association Unit Owners of this Condominium, called and convened in accordance with the By-Laws, the affirmative vote of the

8

Doc 0001869 BK OR 11201 Vol 127 Pg

Voting Members casting not less than three-fourths (3/4) of the total vote of the members of the Association.

All amendments shall be recorded with the 'County Clerk of Cameron County, Texas. No amendment shall change any Condominium Parcel, nor a Condominium Unit's proportionate share of the Common Expenses or Common Surplus, nor the voting rights appurtenant to any Unit, unless all record owners thereof, and all record owners of mortgages or other voluntarily placed liens thereon, shall join in the execution of the amendment. No amendment shall be passed which shall impair or prejudice the rights of any lessor's interest with respect to any Unit in which the owner thereof holds a leasehold interest.

## ARTICLE V.
## BY-LAWS

The operation of the Condominium Property shall be governed by the By-Laws which are set forth in a document entitled "By-Laws of Long Island Village Owners Association, Inc." recorded in the Official Records, Cameron County, Texas.

No modification or amendment to the By-Laws of said Association shall be valid unless set forth in, or annexed to, a duly recorded amendment of this Declaration. The By-Laws may be amended in the manner provided for therein, but no amendment to said By-Laws shall be adopted which would affect or impair the validity or priority of any mortgage covering the Condominium Parcels, or that would adversely affect or impair the Association rental rights.

## ARTICLE VI.
## ASSESSMENTS

The Association, through its Board of Directors, shall have the power to fix and determine, from time to time, the sum or sums necessary and adequate to provide for the Common Expenses of the Condominium Property, and such other Assessments as are specifically provided for in this Declaration and the By-Laws. The procedure for the determination of such Assessments shall be set forth in the By-Laws of the Association.

The Common Expenses shall be assessed against each Parcel Owner, as provided in Article III. of this Declaration.

Assessments that are unpaid for fifteen (15) days after due date shall bear interest at the rate of Ten percent (10%) per annum, from due

9

date until paid, or at the sole discretion of the Board of Directors, a late charge of up to $25.00 shall be due and payable.

The Association shall have a lien on each Condominium Parcel for any unpaid Assessments, together with interest thereon, and against the Unit Owner of such Condominium Parcel, together with a lien on all tangible personal property located upon said Unit. The lien of the Assessments provided for in this Article VI shall be prior and superior to all other liens except only (a) ad valorem taxes and (b) all sums unpaid on the first mortgage to secure debt of record. The sale or transfer of any Unit shall not affect the Assessments lien; provided, however, that the sale or transfer of any Unit pursuant to the foreclosure of a first mortgage thereon, shall extinguish the lien of such Assessments as to the payments thereof which became due prior to such sale or transfer. No sale or transfer shall relieve such Unit from liability for any Assessments thereafter become due or from the lien thereof. Reasonable attorneys' fees incurred by the Association incident to the collection of such Assessment for the enforcement of such liens, together with all sums advanced and paid by the Association for taxes and payments on account of superior mortgages, liens, or encumbrances which may be required to be advanced by the Association in order to preserve and protect its lien, shall be payable by the Unit Owner and secured by such lien.

The Board of Directors may take such action as they deem necessary to collect Assessments by personal action, or by enforcing and foreclosing said liens, and may settle and compromise the same, if in the best interests of the Association. The Association shall be entitled to bid at any sale held pursuant to a suit to foreclose an Assessment lien and to apply, as a cash credit against its bid, all sums due the Association covered by the lien enforced. In case of such foreclosure, the Unit Owner shall be required to pay a reasonable rental for the Condominium Parcel, and the plaintiff in such foreclosure shall be entitled to the appointment of a receiver to collect same from the Unit Owner and/or Occupant.

The Association shall have the right, in lieu of foreclosure, if it deems prudent, to take possession of said Condominium Unit and, offer the same for rental. From the proceeds of such rental, if any, the Association shall credit one-half of the income therefrom to the arrearages and in payment of the lien established by the default of the said Parcel Owner, and to pay the other one-half to the association as its charge for acting as rental agent. The Association shall likewise, if necessary, in order to carry out this right of rental, remove any travel trailer in place on such Condominium Unit and place the same in storage, all without liability to the Association. The selection of this mode

10

Doc 0018690 Bk OR 11201 Vol 129 Pg

of procedure, in payment of the lien established by said arrearages and delinquencies, shall not be exclusive, and the Association may, at any time, proceed in foreclosure should it deem the same necessary, expedient or prudent, and no question of judgement may be raised, as this right of renting is an absolute right and a part of this Declaration.

Any purchaser through foreclosure of a first mortgage lien, by either trustees sale or judicial sale, and either the mortgagee or other purchaser at any such foreclosure sale, shall be exempt from payment of any Assessments which became due prior to such foreclosure.

Any other person acquiring the real property interest in a Unit, shall not be entitled to occupancy of the Unit or enjoyment of the Common Elements until such time as all unpaid Assessments due and owing by the former Unit Owner have been paid, unless Texas State Law provides otherwise.

## ARTICLE VII.
## PROVISIONS RELATING TO SALE OR RENTAL
## OF CONDOMINIUM UNITS

No restrictions are placed herein as far as assigning any Condominium Units. The Association, however, shall have until March 20, 2072, the exclusive right, in the absence of use by the Owner, to rent lots, which are a part of the Condominium as established by the Declaration, at scheduled rates promulgated, from time to time, by the Association. The Association shall retain, for its services, tendered in operating the rental program, fifty percent (50%) of the gross amount of the rental collected on any lot, with the remaining 50% reserved for the benefit of the lot owner. As a partial consideration for the aforesaid, the Association shall under take an advertising program to promote the rental of said Units, both those Units, if any, owned by the association, and those Units sold and in private ownership. This exclusive right of the Association to rent lots which are a part of the condominium as established by the Declaration shall be binding on each member, his successors and assigns, and shall constitute a covenant running with the title, whether leasehold or fee simple, of each Condominium Unit.

## ARTICLE VIII.
## INSURANCE PROVISIONS

### A. Liability Insurance

The Board of Directors of the Association shall obtain Public Liability and Property Damage insurance covering all of the Common Elements and the Condominium Units owned by the Association, and

11

Doc 00018690 Bk OR 11201 Vol Pg 130

insuring the Association and the Unit Owners as its and their interest appear, in such amounts as the Board of Directors of the Association may determine, from time to time, provided that the minimum amount of coverage shall be $250,000/$500,000/$10,000. Said insurance shall include, but not limit the same, to water damage, if available, legal liability, hired automobile, non-owned automobile and off-premises employee coverages. All liability insurance shall, if applicable, contain cross-liability endorsement to cover liabilities of the Unit Owners as a group to a Unit Owner. Premiums for payment of such insurance shall be paid by the Association and charged as a common expense.

### B. Casualty Insurance

1. Purchase of Insurance. The Association shall obtain fire and extended coverage insurance and vandalism and malicious mischief insurance, insuring all of the insurable improvements owned by the Association within the Condominium, including personal property owned by the Association, in and for the interest of the Association, all Unit Owners and their mortgagees, as their interest may appear, in a company acceptable to the standards set by the Board of Directors of the Association, in an amount equal to the maximum insurable replacement value, as determined annually by the Board of Directors of the Association; the premiums for such coverage and other expenses in connection with said insurance shall be paid by the Association and charged as a common expense. The company or companies with whom the Association shall place its insurance coverage, as provided in this Declaration, must be good and responsible companies authorized to do business in the State of Texas.

2. Loss Payable Provisions. All policies purchased by the Association shall be for the benefit of the Association, all Unit Owners and their mortgagees, if any, as their interests may appear.

A. Surplus. It shall be presumed that the first monies disbursed in payment shall be made from the insurance proceeds; and if there is a balance in the funds after payment of all costs of repair and restoration such balance shall be distributed to the Association's general fund.

B. Plans and Specifications. Any repair and restoration must be substantially in accordance with the plans and specifications for the original improvements, or according to the plans approved by the Board of Directors of the Association which approval shall not be unreasonably withheld.

C Such other insurance shall be carried as the Board of Directors

12

March 2005 Restated Declaration

Doc #0018690 Bk OR 11201 Vol 131 Pg

of the Association shall determine, from time to time, to be desirable.

D. Each individual Unit Owner shall be responsible for purchasing at such owner's expense, any additional liability insurance as such owner may deem necessary to cover incidents occurring upon such owner's own Unit and for the purchasing of insurance on such owner's own personal property.

## ARTICLE IX.
## USE AND OCCUPANCY

1. All lots, parcels or units which are designated on Exhibit "B" as recreational vehicle sites shall be reserved and restricted for recreational lots for vehicles in the following categories: Self-contained travel trailers, park model trailers, fifth-wheel trailers and motor homes. Said vehicles or trailers must be designated as a recreational vehicle by RVIA or FMCA. All vehicles brought into the Village as well as all construction in the Village, must conform to the Building Rules and Regulations as set forth in the Rules and Regulations. Any vehicle or travel trailer brought into the resort and not intended to be tied down or skirted must be kept in a towing or driving condition at all times. Appropriately sized pleasure boats will be permitted to remain at boat docks abutting certain Units and boat trailers and boats will be allowed to be parked on doublewide concrete pads. No tents, trailer tents, vans or campers that are not self-contained will be allowed in the Village. No manufactured homes as described in Article 5221F of the Texas Manufactured Housing Standard Act will be permitted to be placed on any site. Only one (1) principal recreational vehicle may be located or maintained on any lot.

2. No animals or fowl shall be kept or maintained on any Unit lot except customary household pets, and then only on a leash. No signs of any kind, other than name and lot number shall be displayed on any lot Unit without the written consent of the Association, or its assigns or successors.

3. An easement ten (10) feet in width is reserved along each of the lot lines of each Unit lot for the installation and maintenance of utility services, and it is understood that each such easement may be used by the Association for such installation and maintenance, as the case may be.

4 No outside toilets shall be installed or allowed on any Unit lot

5. No nuisance shall be permitted on the Condominium Property, nor any use or practice which is the source of annoyance to residents, or

13

March 2005 Restated Declaration

Doc 00018690 Bk OR 11201 Vol 132 Pg

which interferes with the peaceful possession of the property by its residents. All parts of the property shall be kept in a clean and sanitary condition, and no junk, rubbish, refuse, or garbage shall be allowed to accumulate, or any fire hazard allowed to exist.

6. No commercial activity of any kind whatsoever shall be conducted on or from any Unit lot or parcel.

7. The Association shall levy and collect a reasonable monthly Assessment against Unit Owners sufficient to cover each Unit Owner's proportionate share of the actual cost of maintaining and caring for each Unit Owner's individual site as well as the actual cost of operating and maintaining all common use property and facilities, providing water, electricity and garbage disposal service, sewage service, general maintenance and carrying out it's duties hereunder as "Management." Likewise, the Association shall include in the Assessments so made the sum adequate to pay all real property taxes on the Condominium Parcel, as well as the Common Elements, unless the taxing authorities elect to tax said properties in the manner provided in Article XIII. The collection of these sums shall be provided for in an adequate manner to assure the maintenance necessary. The Assessments for expenses shall be levied in accordance with Article III hereof and the By-Laws.

8. These restrictions shall be considered as covenants running with the land or real property interests and shall bind the purchasers of all Units shown on the subdivision plat or plats subjected to this Condominium regime, recorded or to be recorded, their heirs, executors, administrators, successors or assigns; and if any of them shall violate any of the covenants or restrictions herein contained, it shall be lawful for any person or persons owning such Units to prosecute any proceeding at law or in equity against the person or persons violating or attempting to violate any such covenant or restriction and, either to prevent him or them from doing so, to recover damages for such violation, including costs of the suit and a reasonable attorneys fee. Any invalidation of any of these covenants and restrictions shall in no way effect any other of the provisions thereof which shall thereafter remain in full force and effect.

9. The Unit Owner shall not permit nor suffer anything to be done or kept on such owner's Unit which will increase the rate of insurance on the Condominium Property, which will obstruct or interfere with the rights of other Unit Owners, or annoy them by unreasonable noises or sights or otherwise; nor shall the Unit Owner commit or permit any nuisance, immoral or illegal acts in or about the Condominium Property.

10. No person shall use the Common Elements or any part

14

Doc 0000018690 OR Bk 11201 Vol Pg 133

thereof, or a Condominium Unit or the Condominium Property or any part thereof, in any manner contrary to or not in accordance with such rules and regulations pertaining thereto, as from time to time may be promulgated by the Association.

## ARTICLE X.
## MAINTENANCE AND ALTERATIONS

A. The Board of Directors of the Association may enter into a contract with any firm, person or corporation for the maintenance and repair of the Condominium Property, and may join with other condominium corporations in the contracting with the same firm, person or corporation for maintenance and repair.

The Board of Directors may likewise enter into a contract with the owners of any public utility for the furnishing of such public services as electricity, water or sewage disposal to the Condominium. This may include the purchase by the Condominium of wholesale electricity or the payment for the use of any sewage disposal plant. The Board of Directors may likewise, from time to time enter into long term leases for the use of such public service utilities or may purchase the same outright, and thereafter the said facility may, by an amendment to this Declaration, become a part of the common use elements.

B. Although the Association may construct additional facilities for the benefit of the Condominium, there shall be no material alterations or substantial additions to the Common Elements or Limited Common Elements, except as provided hereinabove in Section A, or except as the same are authorized by the Board of Directors and ratified by the affirmative vote of Voting Members casting not less than seventy-five percent (75%) of the total votes of the members of the Association present at any regular or special meeting of the Unit Owners called for that purpose; provided the aforesaid alterations or additions do not prejudice the right of any Unit Owner unless said Unit Owner's consent has been obtained. The cost of the foregoing by the Association shall be assessed as Common Expenses. Where any alterations or additions as aforedescribed are exclusively or substantially exclusively for the benefit of the Unit Owners requesting same, then the cost of such alterations or additions shall be assessed against and collected solely from the Unit Owners exclusively or substantially exclusively benefiting and the Assessment shall be levied in such proportion as may be determined as fair and equitable by the Board of Directors of the Association. Where such alterations or additions exclusively or substantially exclusively benefit Unit Owners requesting same, said alterations or additions shall only be made when authorized by the Board of Directors and ratified by not less than seventy-five percent (75%) of the total votes of the Unit

15

Doc #00018590 Bk OR 11201 Vol 134 Pg

Owners exclusively or substantially exclusively benefiting therefrom, and, where said Unit Owners are ten or less, the approval of all but one shall be required.

## ARTICLE XI.
### TERMINATION

All of the Unit Owners collectively may terminate this condominium regime and request the County Clerk of Cameron County, Texas, to regroup or merge the records of the filial estates with the principal property, provided that the filial estates are unencumbered, or, if encumbered, that the creditors in whose behalf the encumbrances are recorded agree to accept as security the undivided portions of the property owned by the debtors. The undivided interest in the property owned in common which shall appertain to each Unit Owner shall be the percentage of undivided interest previously owned by such owner in the Common Elements.

## ARTICLE XII.
### RETENTION OF INTEREST

**Intentionally Omitted as No Longer Applicable**
[NOTE: This Article in the original Outdoor Resorts/South Padre Declaration dealt with certain rights reserved by the "Developer." The Developer no longer exists, and there appears no evidence that the rights reserved in this section were ever transferred to anyone prior to the Developer's demise.]

## ARTICLE XIII.
### MISCELLANEOUS PROVISIONS

A. Escrow Account for Insurance and Certain Taxes.

There shall be established by the Association and maintained in a local, national or state bank or federal or state savings and loan association, two (2) interest bearing savings deposit accounts in order to accumulate sufficient monies for the following purposes:

1. To pay all insurance premiums for insurance on the Condominium Property obtained and purchased by the Association pursuant to Article VIII of this Declaration; and

2. To pay all real or personal property taxes assessed by the taxing authorities aforedescribed for property owned by the Condominium or taxes which the Condominium is required to pay as part of its

16

Doc 00018690 BK OR 11201 Vol 1355 Pg

Common Expenses.

On or before the twenty-eighth (28th) day of each month, the Treasurer of the Association shall cause two (2) checks to be drawn on the Association bank account, each check being equal respectively to one-twelfth (1/12th) of the estimated yearly amounts as to Items 1 and 2 above. Said checks shall be immediately deposited into the appropriate savings deposit account.

Should a Condominium Unit Owner fail to pay that portion of the monthly Assessment relating to Items 1 and 2 above within thirty (30) days from the due date, the Association shall have the right, but it is not required, to advance the necessary funds so as to deposit the required monthly sum into the savings deposit accounts.

The Association shall have a lien against the applicable Condominium Unit for all sums so advanced, together with interest thereon at the rate of 10% per annum. It shall also have the right to assign its lien to any Unit Owner or group of Unit Owners or to any third party. Said lien shall be subordinate to the lien of any Institutional Mortgagee holding a first priority lien mortgage on a Condominium Unit.

The Condominium Unit Owners herein consent to the establishment of such a lien as a result of these advances in favor of the institution or Association, as aforedescribed. However, no such foreclosure action may be brought by said institution or individual or group of individuals where the Association advances the necessary funds and assigns its lien until the delinquent Unit Owner has received not less than twenty one (21) days written notice in this regard.

B. The owner of the respective condominium Units shall not be deemed to own pipes, wires, conduits, roads, sewage connections, etc., or other public utility lines running through the Condominium Parcel or Unit which are utilized by or serve more than one (1) Condominium Unit, which items are by these presents made a part of the Common Elements.

C. With respect to encroachments existing as of March 3, 1982, the date of the Outdoor Resorts/South Padre Declaration, the owners of the respective Condominium Units agreed that if any portion of a Condominium Unit or Common Element or Limited Common Element encroaches upon another, a valid easement for the encroachment and maintenance of same, so long as it stands, shall and does exist.

D. No owner of a Condominium Parcel may exempt said owner from liability for said owner's contribution toward the Common Expenses by waiver of the use of and enjoyment of any of the Common Elements,

17

March 2005 Restated Declaration

Doc 00018690 Bk OR 11201 Vol 136 Pg

or by the abandonment of said owner's Condominium Unit.

E.   In the event that any taxing authority, shall assess ad valorem taxes on a Condominium Parcel, the Association will not assess the member for real or personal property tax assessed against the Condominium, nor will the Association maintain in the escrow account for payment of same as set forth in Subparagraph "A" hereof. Nothing herein shall be construed however, as giving to any Unit Owner the right of contribution or any right of adjustment against any other Unit Owner on account of any deviation by the taxing authorities for the valuations herein prescribed, each Unit Owner to pay such ad valorem taxes and special assessments as are separately assessed against his Condominium Parcel as set out hereinabove.

For the purpose of ad valorem taxation, the interest of the owner of a "Condominium Parcel" in such owner's "Condominium Unit" and in the "Common Elements" shall be considered as a unit. The value of said unit shall be equal to the percentage of the value of the entire Condominium, including land and improvements as has been assigned to said Unit and as set forth in this Declaration. The total of all of said percentages equals 100% of the value of all of the land and improvements.

F.   All provisions of this Declaration and Exhibits attached hereto and amendments thereof shall be construed to be covenants running with the land and of every part thereof and interest therein, including, but not limited to, every Unit and appurtenances thereto, and every Unit Owner and claimant of the property or any part thereof or of any interest therein, and his heirs, executors, administrators, successors and assigns, shall be bound by all of the provisions of said Declaration and Exhibits annexed hereto and amendments hereof.

G.   If any provisions of this Declaration or of the By-Laws, or of the Rules and Regulations, or of the Condominium Act, or any section, sentence, clause, phrase or word, or the application thereof, in any circumstances is held invalid, the remainder of this Declaration, the By-Laws, the Rules and Regulations, or the Condominium Act, and of the application of any such provision, Section, sentence, clause, phrase or word in other circumstances shall not be affected thereby.

H.   Whenever notices are required to be sent hereunder, the same may be delivered to Unit Owners, either personally or by mail, addressed to such Unit Owners at their place of residence in the Condominium, unless the Unit Owner has, by written notice duly receipted for, specified a different address. Proof of such mailing or personal delivery by the Association shall be given by the affidavit of the person mailing or person

18

March 2005 Restated Declaration

Doc 0001869D   Bk OR 11201   Vol 1377   Pg

delivering said notices. Notices to the Association shall be delivered by U.S. Mail to the office of the Association at the following address:

·P.O. Box 695<br>
Port Isabel, TX 78578

or other such places as designated by the Board of Directors.

Intentionally omitted as no longer applicable.

J.     Intentionally omitted as no longer applicable.

K.     Intentionally omitted as no longer applicable

[NOTE:     The foregoing paragraphs I, J and K in the original Outdoor Resorts/South Padre Delcaration dealt with certain rights reserved by the "Developer." The Developer no longer exists, and there appears no evidence that the rights reserved in these paragraphs were ever transferred to anyone prior to the Developer's demise.]

L.     The Condominium Act of the State of Texas, shall be in full force and effect. In addition thereto, should the Association find it necessary to bring a Court action to enforce compliance with the law or this Declaration, the By-Laws, or the Rules and Regulations, upon finding by the Court that the violation complained of is willful and deliberate, the Unit Owner so violating shall reimburse the Association for reasonable attorney's fees incurred by said Association in bringing such action, as determined by the Court.

M.     Whenever the context so requires, the use of any gender shall be deemed to include all genders, and the use of the singular shall include the plural, and the plural shall include the singular. The provisions of the Declaration shall be liberally construed to effectuate its purpose of creating a uniform plan for the operation of a condominium.

N.     The captions used in this Declaration and Exhibits annexed hereto are inserted solely as a matter of convenience and shall not be relied upon and/or used in construing the effect or meaning of any of the text of this Declaration or Exhibits annexed hereto.

O.     If any term, covenant, provision, phrase, or other element of the Condominium Documents is held invalid or unenforceable for any reason whatsoever such holding shall not be deemed to affect, alter, modify, or impair in any manner whatsoever, any other term, provision, covenant or element of the Condominium Documents.

19

Doc 0001869 Bk OR 11201 Vol 138 Pg

P. The Association specifically disclaims any intent to have made any warranty or representation in connection with the property or the Condominium Documents, except as specifically set forth therein, and no person shall rely upon any warranty or representation not so specifically made therein. Any estimates of Common Expenses, taxes or other charges are deemed accurate, but no warranty or guaranty is made or intended, nor may one be relied upon.

Q. In the event that any utility service is separately charged by the utility company to a Unit Owner by individual meters, or otherwise, then the Unit Owner shall not be assessed by the Association for this service.

R. The current Bylaws and Rules and Regulations of the Association are separately recorded in the Official Records, Cameron County.

## ARTICLE XIV.
## JOINDER AS MEMBER OF
## LONG ISLAND OWNER'S ASSOCIATION, INC.

The Association shall join the Long Island Owner's Association, Inc. ("LIOA") as a member of LIOA, which LIOA will own the Swing Bridge, roadway and right of way to the Patrick Martin fence, and that the terms of such joinder is as follows:

A. The members of LIOA will be individuals, entities, or corporations or associations, which own or control land on Long Island.

B. The number of votes to which each entity or person is entitled will be based on the taxable value placed on their respective parcels of land by the Cameron County Appraisal District. Each member will have one vote based upon each $100.00 of valuation of their property.

C. This Association (Long Island Village Owner's Association, Inc.) will cast collectively all of the votes designated to its members.

D. The membership acquired in LIOA shall be considered a Common Element of Long Island Village, as such membership will give the Long Island Village Owner's Association, Inc. and its members the right to use the Swing Bridge and the said roadway and right of way.

E. This Association (Long Island Village Owner's Association,

20

Inc.) shall have the power to levy assessments upon its members for its share of the operation and maintenance of the Swing Bridge and roadway as it would for the operation and maintenance of any other Common Element pursuant to the March 2005 Restated Declaration and March 2005 Restated Bylaws of the Association.

F.     This Association's Board of Directors, by and through its President, shall have the power to execute any documents required for the purposes of carrying out this resolution, including the Joinder in the Declaration of Agreement to Join in the Common Ownership, Restoration, Preservation, Maintenance and Operation of the Long Island Swing Bridge.

IN WITNESS WHEREOF, LONG ISLAND VILLAGE OWNERS ASSOCIATION, INC., acting by and through the undersigned, has caused this March 2005 Restated Declaration of Covenants, Conditions and Restrictions for Long Island Village, a Condominium, to be signed and acknowledged for recording on this _____ day of March in the Year 2005.

ATTEST:     LONG ISLAND VILLAGE OWNERS ASSOCIATION, INC.

By: _____          By: _____
    Don Halbach, President

*Acknowledgments*

State of Texas          §
                        §
County of Cameron       §

        This instrument was acknowledged before me on this _10_ day of _March_____, 2005, by Don Halbach, President of Long Island Village Owners Association, Inc., a Texas non-profit corporation, on behalf of said corporation.

_____
Notary Public in and for
Cameron County, Texas

VANESSA L. GARCIA
Notary Public, State of Texas
My Commission Expires
April 02, 2008

21

State of Texas        §
                      §
County of Cameron     §

This instrument was acknowledged before me on this 10 day of March,
2005, by LeRoy R. Mulch, Secretary of Long Island Village Owners Association, Inc., a
Texas non-profit corporation, on behalf of said corporation.

Vanessa _____ Garcia
Notary Public in and for
Cameron County, Texas

VANESSA L. GARCIA
Notary Public, State of Texas
My Commission Expires
April 02, 2008

After recording, return to:
Ramona K. Kantack
The Rentfro Faulk Law Firm
185 E. Ruben M. Torres Sr. Blvd.
Brownsville, TX   78526

March 2005 Restated Declaration

Doc 0000018690  Bk OR 11201  Vol  Pg 141

**WHEREAS,** the Long Island Village Owners Association, Inc. (the "Association") has filed a March 2005 Restated Declaration of Covenants, Conditions and Restrictions for Long Island Village, a Condominium, recorded as Document # _18690_ in the Official Records, Cameron County, Texas (the "March 2005 Restated Declaration"), for reasons stated therein and as a result of certain Changes described therein and incorporated herein by reference, concerning the following real property:

> The real property described in Volume 14, Pages 691-705, and in Volume 5271, page 53, of the Official Records, Cameron County, Texas;

and

**WHEREAS** the Association previously amended the Bylaws for the Association in the following amendments recorded in the Official Records of Cameron County, Texas:

> (a) amendment dated March 1, 1989, recorded in Volume 754, Page 183-187;
> (b) amendment dated March 28, 1991, recorded in Volume 1587, Page 22-32;
> (c) amendments adopted January 29, 2005, recorded as Document #00007645 (the "January 2005 Amendments");

and

**WHEREAS** the Association, at its annual membership meeting held March 5, 2005, approved an amendment to Article VII, and the addition of Article XVIII, to the Bylaws for the Association (the "March 2005 Amendments"); and

**WHEREAS** the Association previously restated its Bylaws in the Document #00041532 in Volume 10392, Page 140-158, in the Official Records, Cameron County, Texas (the "Restated Bylaws"), in order to state the Association's Rules and Regulations (that were originally designated as Article XVII to the Bylaws) in another, separate document, and to eliminate the confusion created by (a) attachment of the Bylaws to the Declaration, which are severable from the Declaration under Texas law; (b) piecemeal amendments to the Bylaws recorded in the Official

Doc 00018691 Bk OR 11201 Vol 143 Pg

Records of Cameron County, Texas; (c) references in the original Bylaws that are no longer correct or applicable as a result of the Changes set forth in the restated versions of the Declaration filed in the Cameron County Official Records; (d) other references in the Bylaws to provisions that did not exist; and (e) designation of the Rules and Regulations as Article XVII to the Bylaws when different rules apply to amendment of the Rules and Regulations than apply to amendment of the Bylaws or the Declaration; and

**WHEREAS** the Association desires to further restate the Restated Bylaws in their entirety in one document, in order (1) to include the January 2005 Amendments and the March 2005 Amendments in the complete bylaws document filed in the Official Records; and (2) to correct certain errors inadvertantly made in restating the original Bylaws in the Restated Bylaws document;

**KNOW ALL MEN BY THESE PRESENTS:** that these March 2005 Restated Bylaws for Long Island Village Owners Association, Inc. are made on the date hereinafter set forth by the Association.

## ARTICLE I. IDENTITY

The following March 2005 Restated Bylaws shall govern the operation of the Condominium known as LONG ISLAND VILLAGE, a Condominium described and named in the March 2005 Restated Declaration to which these Bylaws pertain. LONG ISLAND VILLAGE OWNERS ASSOCIATION, INC. is a Texas corporation not for profit, organized and existing in compliance with Texas law, and the Condominium Act, Chapter 81 of the Texas Property Code, which said act has been adopted by reference in said Declaration.

**Section 1.** The Office of the Association shall be at the Condominium Property, or at such other places as may be designated by the Board of Directors.

**Section 2.** The Seal of the Corporation, if created, shall bear the name of the Corporation, the word "Texas, the words "Corporation Not for Profit," and the year of incorporation.

**Section 3.** As used herein, the word "Corporation" shall be the equivalent of "Association," as defined in the March 2005 Restated Declaration to which these Bylaws pertain, and all other words, as used herein, shall have the same definition as attributed to them in the March 2005 Restated Declaration to which these Bylaws pertain.

2

## ARTICLE II. MEMBERSHIP AND VOTING PROVISIONS

**Section 1. Stock.** The Corporation shall not issue stock or certificates.

**Section 2. Membership.** Membership in the Corporation shall be limited to owners of Condominium Units, as identified in the March 2005 Restated Declaration. Transfer of Unit ownership, either voluntary or by operation of law, shall terminate membership in the Corporation, said membership is to become vested in the transferee. If Unit ownership is vested in more than one person, then all of the persons so owning said Unit shall be members eligible to hold office, attend meetings, etc., but as hereinafter indicated, the vote of a Unit shall be cast by the "Voting Member." If Unit ownership is vested in a corporation, said corporation may designate an individual officer or employee of the corporation as its "Voting Member." Any application for the transfer of membership, or for a conveyance of an interest in, or to encumber or lease a Condominium Parcel, where the approval of the Board of Directors of the Association is required, as set forth in these March 2005 Restated Bylaws and the March 2005 Restated Declaration to which they pertain, shall be accompanied by an application fee in an amount to be set by the Board of Directors to cover the cost of contacting the reference given by the applicant, and such other costs of investigation that may be incurred by the Board of Directors.

**Section 3. Voting**

(a) The owner(s) of each Condominium Unit shall be entitled to one vote for each Condominium Unit owned. If a Condominium Unit Owner owns more than one Unit said owner shall be entitled to one (1) vote for each Condominium Unit owned.

(b) A majority of the Unit Owners' total votes shall decide any question unless the March 2005 Restated Bylaws or March 2005 Restated Declaration provides otherwise, in which event the voting percentage required in the March 2005 Restated Bylaws or the March 2005 Restated Declaration shall control.

**Section 4. Quorum.** Unless otherwise provided in these March 2005 Restated Bylaws, the presence in person or by proxy of a majority of the Unit Owners' total votes shall constitute a quorum. The term "majority" of the Unit Owners total votes shall mean Unit Owners holding fifty-one (51%) percent of the votes.

**Section 5. Proxies.** Votes may be cast in person or by proxy. All proxies shall be in writing and signed by the person entitled to vote (as set forth below in Section 6), and shall be filed with the Secretary prior to the

3

Doc 000018691 BK OR 11201 Vol Pg 145

meeting in which they are to be used and shall be valid only for the particular meeting designated therein. Wherein a Unit is owned jointly by a husband and wife, and if they have not designated one of them the Voting Member, a proxy must be signed by both husband and wife where a third person is designated.

**Section 6. Designation of Voting Member.** If a Condominium Unit is owned by one person, said person's right to vote shall be established by the recorded title to the Unit. If a Condominium Unit is owned by more than one person, the person entitled to cast the vote for the Unit shall be designated in a certificate signed by all of the recorded owners of the Unit and filed with the Secretary of the Association. If a Condominium Unit is owned by a corporation, the officer or employee thereof entitled to cast the vote of the Unit for the corporation shall be designated in a certificate for this purpose, signed by the President or Vice-President and attested to by the Secretary or Assistant Secretary of the corporation, and filed with the Secretary of the Association. The person designated in these certificates who is entitled to cast the vote for a Unit shall be known as the "Voting Member." If such a certificate is not on file with the Secretary of the Association for a Unit owned by more than one person or by a corporation, the vote of the Unit concerned shall not be considered in determining the requirement for a quorum or for any purpose requiring the approval of a person entitled to cast the vote for the Unit, except if said Unit is owned by a husband and wife. Such certificates shall be valid until revoked, or until superseded by a subsequent certificate, or until a change in the ownership of the Unit concerned. If a Condominium Unit is jointly owned by a husband and wife the following three provisions are applicable thereto:

> (a) They may, but they shall not be required to, designate a Voting Member.

> (b) If they do not designate a Voting Member, and if both are present at a meeting and are unable to concur in their decision upon any subject requiring a vote, they shall lose their right to vote on that subject at that meeting. (As previously provided, the vote of a Unit is not divisible).

> (c) Where they do not designate a Voting Member, and only one is present at a meeting, the person present may cast the Unit vote, just as though said owner owned the Unit individually, and without establishing the concurrence of the absent person.

4

Doc 0200018691 Bk OR 11201 Vol 1 146 Pg

## ARTICLE III. MEETINGS OF THE MEMBERSHIP

**Section 1. Place** - All meetings of association membership shall be held at the Condominium Property, or at such other place and time as shall be designated by the Board of Directors of the Association and stated in the Notice of Meeting.

**Section 2. Notices** – It shall be the duty of the Secretary to mail a Notice of each annual or special meeting, stating the time and place thereof to each Unit Owner of record, at least fourteen (14), but not more than twenty-eight (28) days prior to such meeting. Notice of any special meeting shall state the purpose thereof. All notices shall be mailed to or served at the address of the Unit Owner as it appears on the books of the Corporation.

**Section 3. Order of Business** – The order of business at annual members' meetings, and, as far as practical, at all other members' meetings, shall be:

    (a) Election of Chairman of the Meeting
    (b) Calling of the Roll and Certifying of Proxies
    (c) Proof of Notice of Meeting or Waiver of Notice
    (d) Reading and Disposal of any Unapproved Minutes
    (e) Reports of Officers
    (f) Reports of Committees
    (g) Election of Inspectors of Election
    (h) Election of Directors
    (i) Unfinished Business
    (j) New Business
    (k) Adjournment

**Section 4. Annual Meeting** – The annual meeting shall be held at the Condominium Property on the first (1st) Saturday in March, and thereafter on the first (1st) Saturday in March of each year, for the electing of Directors and transacting other business authorized to be transacted by the members; provided, however, that if that day is a legal holiday, the meeting shall be held at the same hour on the next secular day following. At the annual meeting the members shall elect by a plurality vote (cumulative voting prohibited), a Board of Directors and transact such other business as may be properly brought before the meeting.

**Section 5. Special Meeting** - Special Meetings of the members for any purpose or purposes, unless otherwise prescribed by statute or by the Articles of Incorporation, may be called by the President, and shall be called by the President or Secretary at the request, in writing, of a

5

Doc 00018691 BK OR 11201 Vol 1479 Pg

majority of the Board of Directors, or at the request, in writing, of Voting Members representing a majority of the Unit Owners' total votes, which request shall state the purpose or purposes of the proposed meeting. Business transacted at all special meetings shall be confined to objects stated in the notice thereof.

**Section 6. Waiver and Consent** - Whenever the vote of members at a meeting is required or permitted by any provision of the statutes or of the Articles of Incorporation, or of these March 2005 Restated Bylaws to be taken in connection with any action of the Corporation, the meeting and vote of members may be dispensed with if all the members who would have been entitled to vote upon the action if such meeting were held, shall consent in writing to such action being taken.

**Section 7. Adjourned Meeting** - If any meeting of members cannot be organized because a quorum of Voting Members is not present, either in person or by proxy, the meeting may be adjourned from time to time until a quorum is present.

**Section 8. Intentionally omitted.**

**Section 9. Approval or Disapproval of a Unit Owner** upon any matter, whether or not the subject of an Association meeting, shall be by the "Voting Member"; provided, however, where a Unit is owned jointly by a husband and wife and they have not designated one of them as a Voting Member, their joint approval or disapproval shall be required where both are present, or in the event only one is present, the person present may cast the vote without establishing the concurrence of the absent person.

## ARTICLE IV. DIRECTORS.

The Board of Directors shall consist of nine (9) members. At each annual meeting, the directorships of those whose terms have expired shall be elected from the voting members for a period of three years, it being the intent that there shall be three directors at each annual membership meeting for a period of three years. All members of the Board of Directors shall be owners, in good standing, of a Condominium Unit or the owner of an interest therein.

**Section 1. – Board of Directors**
(a) Intentionally omitted.
(b) The organizational meeting of a newly elected Board of Directors shall be held within ten (10) days of their election at such place and time as shall be fixed by the Directors at the meeting at which they were elected and no further notice of the organizational meeting shall be necessary providing a quorum shall be present.

6

**Section 2. – Removal of Directors.** At any duly convened regular or special meeting, any one or more of the Directors may be removed with or without cause by the affirmative vote of the Voting Members casting not less than a majority of the total of members in the Association, and a successor may then and there be elected to fill the vacancy thus created. Should the membership fail to elect said successor, the Board of Directors may fill the vacancy in the manner provided in Section 3 below.

**Section 3. - Vacancies on Directorate.** If the office of any Director or Directors becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, a majority of the remaining Directors, though less than a quorum, shall choose a successor, or successors, who shall hold office until the next annual meeting, at which time the membership will elect a replacement. The election held for the purpose of filling said vacancy may be held at any regular or special meeting of the Board of Directors.

**Section 4. - Disqualification and Resignation of Directors.** Any Director may resign at any time by sending a written notice of such resignation to the office of the Corporation delivered to the Secretary. Unless otherwise notified therein such resignation shall take effect upon receipt thereof by the Secretary. More than three (3) consecutive absences from regular meetings of the Board of Directors, unless excused by resolution of the Board of Directors, shall automatically constitute a resignation effective upon acceptance by the Board of Directors. In the event a Director ceases to be an owner of a Condominium Unit or having an interest therein, or in the event a corporate ownership ceases to be an officer of said corporation, the directorship shall immediately and automatically terminate. No member shall continue to serve on the Board should said member be more than thirty (30) days delinquent in the payment of an assessment and said delinquency shall automatically constitute a resignation effective when such resignation is accepted by the Board of Directors.

**Section 5. - Regular Meetings** - The Board of Directors may establish a schedule of regular meetings to be held at such time and place as the Board of Directors may designate. Notice of such regular meetings shall, nevertheless, be given to each Director personally or by mail, telephone, or telegraph, at least five (5) days prior to the day named for such meeting.

**Section 6. Special Meetings** - Special meetings of the Directors may be called by the President and must be called by the Secretary at the written request of one-third (1/3rd) of the votes of the Board. Not less than five (5) days' notice of the meeting shall be given personally or by mail,

7

Doc 00018691 OR BK 11201 Vol Pg 149

telephone or telegraph, which notice shall state, the time, place and purpose of the meeting.

**Section 7. Directors' Waiver of Notice** - Before or at any meeting of the Board of Directors, any Director may waive notice of such meeting and such waiver shall be deemed equivalent to the giving of notice. Attendance by a Director at any meeting of the Board shall be a waiver of notice by said Director of the time and place thereof. If all the Directors are present at any meeting of the Board, no notice shall be required and any business may be transacted at such meeting.

**Section 8. Quorum** - At all meetings of the Board of Directors a majority of the Directors shall constitute a quorum for the transaction of business, and the acts of the majority of the Directors present at such meetings at which a quorum is present shall be the acts of the Board of Directors. If, at any meeting of the Board of Directors, there be less than a quorum present, the majority of those present may adjourn the meeting from time to time. At each such adjourned meeting, any business which might have been transacted at the meeting as originally called may be transacted without further notice. The joinder of a Director in the action of a meeting, by signing and concurring in the minutes thereof, shall constitute the presence of such Director for the purpose of determining a quorum.

**Section 9. Compensation** – The Directors' fees, if any, shall be determined by the Voting Members.

**Section 10. Powers and Duties** - The Board of Directors shall have the powers and duties necessary for the administration of the affairs of the Corporation and may do all such acts and things as are not by law or by the March 2005 Restated Declaration or by these March 2005 Restated Bylaws directed to be exercised and done by the Unit Owners. Such powers shall specifically include, but shall not be limited to, the following:

(a) To exercise all powers specifically set forth in the March 2005 Restated Declaration, in these March 2005 Restated Bylaws, the Articles of Incorporation of this Corporation, and in the Condominium Act, and all powers incidental thereto.

(b) To make Assessments, and collect said Assessments, and use and expend the Assessments to carry out the purposes and powers of the Corporation.

(c) To employ, dismiss and control the personnel necessary for the maintenance and operation of the project and of

8

Doc 020018691 Bk OR 11201 Vol 150 Pg

the common areas and facilities, including the right and power to employ attorneys, accountants, contractors and other professionals as the need arises.

(d) To make and amend regulations respecting the operation and use of the Common Elements and Condominium Property and the use and maintenance of the Condominium Units therein.

(e) To contract for the management of the Condominium and to designate to such contractor all of the powers and duties of the Association, except those which may be required by the March 2005 Restated Declaration to have the approval of the Board of Directors or membership of the Association.

(f) To designate one or more committees, which, to the extent provided in the resolution designating such committee, shall have the powers of the Board of Directors in the management of the business and affairs of the Corporation. Such committee shall consist of at least three (3) members of the Corporation, one of whom shall be a Director. The committee or committees shall have such name(s) as may be determined to be needed and one member of the committee shall keep regular minutes of their proceedings and report the same to the Board of Directors as required.

(g) To use and disburse the proceeds of Assessments in the exercise of its powers and duties.

(h) The maintenance, repair, replacement and operation of the Condominium Property.

(i) The reconstruction of improvements after casualty and the further improvement of the property.

(j) To enforce, by legal means, the provisions of the Condominium Documents, the Articles of Incorporation, the March 2005 Restated Bylaws of the Association, and the regulations for the use of the property in the Condominium.

(k) To pay taxes and assessments which are liens against any part of the Condominium other than individual Units and the appurtenances thereto, and to assess the same against the Units subject to such liens.

(l) To pay all the cost of all power, water, sewer and other utility services rendered to the Condominium and not billed to owners of individual Units.

9

Doc 0000018691 Bk OR 11201 Vo 151 Pg

The foregoing powers shall be exercised by the Board of Directors or its contractor or employees subject only to approval by Unit Owners when such is specifically required.

## ARTICLE V. OFFICERS

**Section 1. Elective Officers.** The principal officers of the Corporation shall be a President, a Vice President, a Secretary and a Treasurer, all of whom shall be elected by the Board of Directors. One person may not hold more than one of the aforesaid offices, except one person may be both Secretary and Treasurer. The President and Vice-President shall be members of the Board of Directors. No person shall serve as President unless such person shall have served on the Board of Directors for at least one year immediately prior to such person's appointment as President or Vice-President.

**Section 2. Election** - The officers of the Corporation designated in Section 1 above shall be elected annually by the Board of Directors, at the organizational meeting of each new Board following the meeting of the members.

**Section 3. Appointive Officers** - The Board may appoint an Assistant Secretary and an Assistant Treasurer and such other officers as the Board deems necessary.

**Section 4. Term** - The officers of the Corporation shall hold office until their successors are chosen and qualify in their stead. Any officer elected or appointed by the Board of Directors may be removed at any time, with or without cause, by the Board of Directors, provided, however, that no officer shall be removed except by the affirmative vote for removal by a majority of the whole Board of Directors (e.g. if the Board of Directors is composed of nine persons, then five of said Directors must vote for removal). If the office of any officer becomes vacant for any reason, the vacancy shall be filled by the Board of Directors.

**Section 5. The President** shall be the chief executive officer of the Corporation and shall preside at all meetings of the Unit Owners and of the Board of Directors. The President shall have executive powers and general supervision over the affairs of the Corporation and other officers. The President shall sign all written contracts to perform all of the duties incident to the office and which may be delegated from time to time by the Board of Directors.

10

March 2005 Restated Bylaws

**Section 6. The Vice President** shall perform all of the duties of the President, in the President's absence or disability and such other duties as may be required from time to time by the Board of Directors.

**Section 7. The Secretary** shall issue notices of all Board of Directors' meetings and all meetings of the Unit Owners; shall attend and keep the minutes of the same; and shall have charge of all of the Corporation's books, records and papers except those kept by the Treasurer. The Secretary shall have custody of the seal of the Association. The Assistant Secretary shall perform the duties of the Secretary when the Secretary is absent or incapacitated.

**Section 8. The Treasurer** shall:

(a) Have custody of the Corporation funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all monies and other valuable effects in the name of, and to the credit of, the Corporation in such depositories as may be designated from time to time by the Board of Directors. The books shall reflect an account for each Unit in the manner required by the Condominium Act of the State of Texas, Chapter 81 of the Texas Property Code, as amended.

(b) Disburse the funds of the Corporation as may be required by the Board in accordance with these March 2005 Restated Bylaws, making proper vouchers for such disbursements, and shall render to the President and Board of Directors at the regular meeting of the Board of Directors, or whenever said Board of Directors may require it, an account of all of transactions made by said Treasurer and of the financial condition of the Corporation.

(c) Collect the Assessments and promptly report the status of collections and of all delinquencies to the Board of Directors.

(d) Give status reports to potential transferees upon which the transferees may rely.

(e) The Assistant Treasurer shall perform the duties of the Treasurer when the Treasurer is absent or incapacitated.

## ARTICLE VI. FISCAL MANAGEMENT

**Section 1. Depositories** - The funds of the Corporation shall be deposited in such banks and depositories as may be determined by the Board of Directors from time to time, upon resolutions approved by the Board of Directors, and shall be withdrawn only upon checks and demands for money signed by such officer or officers of the Corporation as may be designated by the Board of Directors. Obligations of the Corporation shall be signed by at least two officers of the Corporation.

**Section 2. Fidelity Bonds** – The Treasurer and all officers who are authorized to sign checks, and all officers and employees of the Association and any contractor handling or responsible for Association funds, shall be bonded in such amount as may be determined by the Board of Directors. The premiums on such bonds shall be paid by the Association. The bond shall be in an amount sufficient to equal the monies an individual handles or has control via a signatory or a bank account or other depository account.

**Section 3. Fiscal Year** - The fiscal year for the Corporation shall begin on the first day of January or each year; provided, however, that the Board of Directors is expressly authorized to change to a different fiscal year in accordance with the provisions and regulations from time to time prescribed by the Internal Revenue Code of the United States of America, at such time as the Board of Directors deems it advisable.

**Section 4. Determination of Assessments.**

(a) The Board of Directors of the Corporation shall fix and determine, from time to time, the sum or sums necessary and adequate for the Common Expenses of the Condominium Property.

Common Expenses shall include expenses for the operation, maintenance, repair or replacement of the Common Elements and the Limited Common Elements, costs of carrying out the power and duties of the Corporation; all insurance premiums and expenses relating thereto, including fire insurance and extended coverage, and any other expenses designated as Common Expenses from time to time, by the Board of Directors of the Corporation. The Board of Directors is specifically empowered, on behalf of the Corporation, to make and collect Assessments, and to maintain, repair and replace the Common Elements and the Limited Common Elements of the Condominium. Funds for the payment of Common Expenses shall be assessed against the Unit Owners in the proportions of percentages of sharing Common Expenses as provided in the Declaration. Said Assessment shall be payable as ordered by the Board of Directors. Special Assessments, should such be

12

Doc 00018691 Bk OR 11201 Vol 154 Pg

required by the Board of Directors, shall be levied in the same manner as hereinbefore provided for regular Assessments, and shall be payable in the manner determined by the Board of Directors.

(b) When the Board of Directors has determined the amount of any assessment, the Treasurer of the Corporation shall mail or present to each Unit Owner, a statement of said Unit Owner's Assessment. All Assessments shall be payable to the Treasurer of the Corporation and, upon request, the Treasurer shall give a receipt for each payment made to him/her.

(c) The owners shall be billed on a quarterly basis for Assessments. The amount of the quarterly Assessment shall be due on the 10th day of the month next following the month in which the statement for the quarterly Assessment is mailed. If such quarterly Assessment is not paid by the 25th day of such month then in that event a penalty of ten percent (10%) per annum shall be imposed on the unpaid balance. When an account is sixty (60) days past due, it shall be forwarded to the attorneys for the Corporation for collection. In the event such account is not paid within ninety (90) days, a non-judicial foreclosure proceeding shall be instituted against the delinquent Unit, or a lawsuit filed for collection of the Assessment, or both.

**Section 5. Application of Payments and Co-Mingling of Funds** - All sums collected by the Association from Assessments may be co-mingled in a single fund, or divided into more than one fund, as determined by the Board of Directors. All Assessment payments by a Unit owner shall be applied as to interest, delinquencies, costs and attorneys' fees, other charges, expenses or advances, as provided herein and in the March 2005 Restated Declaration, and general or special Assessments in such manner as the Board of Directors determines in its sole discretion.

**Section 6. Annual Audit** - An audit of accounts of the Association shall be made annually by a Certified Public Accountant and a copy of the report shall be available for inspection by the members of the Office of the Association, not later than three months after the end of the year for which the report is made.

**Section 7. Acceleration of Assessment Installments Upon Default** - If a Unit Owner shall be in default in the payment of an installment upon any Assessment, the Board of Directors may accelerate the remaining monthly installments for the fiscal year upon written notice thereof to the Unit Owner, and, thereupon, the unpaid balance of the Assessment shall become due upon the date stated in the notice, but not less than fifteen (15) days after the delivery of or mailing of said notice to each Unit Owner.

13

## Section 8. Foreclosure of Lien.

(a) The lien for assessments herein provided for may be foreclosed, without prejudice and subject to the aforesaid prior liens by the holder thereof in the same manner as either a Vendor's Lien, or as is provided for foreclosure of a contractual Deed of Trust lien on real property under Texas Property Code, Section 51.001 et seq. The corporation (association) shall have the power to appoint a person as Trustee for the purpose of any foreclosures pursuant to this Section, and such Trustee shall have all of the powers and duties as would a Trustee appointed pursuant to a Texas Deed of Trust and conducting a sale of real property pursuant to Section 51.002, Texas Property Code.

(b) The Association shall have the power to bid on the Unit foreclosed upon at any foreclosure sale, and to acquire, hold, lease, mortgage and convey the same in behalf of the Association. The Purchaser acquiring title to such Unit at any such foreclosure sale, whoever Purchaser may be, and such Purchaser's heirs, successors and assigns, shall not be liable for the share of the unpaid Common Expenses or Assessments by the Association chargeable to such Unit which became due prior to acquisition of such title at such foreclosure sale, but such Common Expenses shall be collectable from all the owners in this project, including such Purchaser or Acquirer, their heirs, successors and assigns, on a pro rata basis, to the extent not recovered from the proceeds of such foreclosure sale.

(c) The Association shall have the power to terminate any common electric utilities and water for nonpayment of Assessments. In the event Assessments for a Condominium Unit become past due for thirty days (30) the Board may cause the common electric utilities and water to such Unit to be terminated until such time as such Assessments plus interest are paid. The Unit shall also be assessed the expense of such termination and re-connection of such utilities.

## ARTICLE VII. SUBSTANTIAL ADDITIONS OR ALTERATIONS

There shall be no substantial additions or alterations to the Common Elements or Limited Common Elements by the Association unless the same are authorized by the Board of Directors and ratified by the affirmative vote of the Voting members casting not less than 75% of the total votes of the Unit Owners present at any regular or special meeting of the Unit Owners called for that purpose, and provided that such amendment may not alter or destroy a Unit or a Limited Common Element without the consent of the Unit Owner(s) affected and their respective first lien mortgagees.

4

Doc 00018691 Bk OR 112201 Vol 156 Pg

## ARTICLE VIII. COMPLIANCE AND DEFAULT

**Section 1. Violations** - In the event of a violation (other than the non-payment of an Assessment) by the Unit Owner in any of the provisions of the March 2005 Restated Declaration, of these March 2005 Restated Bylaws, of the Rules and Regulations, or of the applicable portions of the Condominium Act, the Association, by direction of its Board of Directors, may notify the Unit Owner by written notice of said breach, transmitted by mail, and if such violation shall continue for a period of thirty (30) days from the date of the notice, the Association, through its Board of Directors, shall have the right to treat such violation as an intentional and inexcusable material breach of the March 2005 Restated Declaration, of the March 2005 Restated Bylaws, of the Rules and Regulations, or of the pertinent provisions of the Condominium Act, and the Association may then, at its option, have the following election:

> (1) An action at law to recover for its damage on behalf of the Association, on behalf of the other Unit Owners;
>
> (2) An action in equity to enforce performance on the part of the Unit Owner;
>
> (3) An action in equity for such equitable relief as may be necessary under the circumstances, including injunctive relief. Upon a finding by the court that the violation complained of is willful and deliberate, the Unit Owner so violating shall reimburse the Association for reasonable attorneys fees incurred by it in bringing such action. Failure on the part of the Association to maintain such an action at law or in equity within thirty (30) days from date of a written request, signed by a Unit Owner, sent to the Board of Directors, shall authorize any Unit Owner to bring an action in equity or suit at law on account of the violation, in the manner permitted by law. Any violations which are deemed by the Board of Directors to be a hazard to public health, may be corrected immediately as an emergency matter by the Association, and the cost thereof shall be charged to the Unit Owner as a specific item which shall be a lien against said Unit with the same force and effect as if the charge were a part of the Common Expense.

**Section 2. Negligence or Carelessness of Unit Owner** - All Unit Owners shall be liable for the expense of any maintenance, repair or replacement rendered necessary by such owner's act, neglect or carelessness, or by that of any member of such owner's family or guests, employees, agents

15

or lessees, but only to the extent that such expense is not met by the proceeds of insurance carried by the Association, if any. Such liability shall include any increase in insurance rates occasioned by use, misuse, occupancy or abandonment of any Unit or its appurtenances. Nothing herein contained shall be construed so as to modify any waiver by insurance companies of rights of subrogation. The expense for any maintenance, repair or replacement required, as provided in this section, shall be charged to said Unit Owner as a specific item which shall be a lien against said Unit with the same force and effect as if the charge were a part of the Common Expense. Said lien shall be subordinate to the lien of any institutional first mortgage on a given Condominium Unit.

**Section 3. Costs and Attorneys Fees** - In any proceeding arising because of an alleged default by a Unit Owner, the prevailing party shall be entitled to recover the costs of the proceeding and such reasonable attorney's fees as may be determined by the court.

**Section 4. No Waiver of Rights** - The failure of the Association or of a Unit Owner to enforce any right, provision, covenant or condition which may be granted by the Condominium Documents shall not constitute a waiver of the right of the Association or Unit Owner to enforce such right, provision, covenant or condition of the future.

**Section 5. No Election of Remedies** - All rights, remedies and privileges granted to the Association or Unit Owner pursuant to any terms, provisions, covenants or conditions of the Condominium Documents, shall be deemed to be cumulative and the exercise of any one or more shall not be deemed to constitute an election of remedies, nor shall it preclude the party thus exercising the same from exercising such other and additional rights, remedies or privileges as may be granted to such other party by the Condominium Documents, or ay law, or in equity.

## ARTICLE IX. ACQUISITION OF UNITS.

(a)  At any foreclosure sale of a Unit the Board of Directors may, with the authorization and approval, by the affirmative vote of Voting Members casting no less than three-fourths of the total votes of the Unit Owners, wherein said matter is voted upon, acquire in the name of the Corporation or its designee, a Condominium Parcel being foreclosed. The term "foreclosure" as used in this section shall mean and include any foreclosure of any lien, except a lien for Assessments. The power of the Board of Directors to acquire a Condominium Parcel at any foreclosure sale shall never be interpreted as any requirement or obligation on the part of the Board of Directors or the Corporation, to do so at any foreclosure sale, the provisions hereof being permissive in nature and for

16

Doc 00018691 OR Bk 11201 Vol 158 Pg

the purpose of setting forth the power in the Board of Directors to do so should the requisite approval of the Voting Members be obtained.

(b)    At a foreclosure sale for Assessments, the Board of Directors shall have the power to acquire, without the prior approval of the owners, in the name of the Corporation or its designee, a Condominium Parcel being foreclosed upon for delinquent Assessments, and shall have the power to bid up to the amount of such Assessments, the reasonable attorney fees and expenses for the collection of same, and any other sums due for which the Corporation has a lien.

## ARTICLE X. AMENDMENTS TO BYLAWS

Subject to the provisions of ARTICLE XVI, SECTION 5, hereof, these Bylaws may be altered, amended or added to at any duly called meeting of the Unit Owners, provided:

(1) Notice of the meeting shall contain a statement of the proposed amendment.

(2) If the amendment has received the unanimous approval of the full Board of Directors, then it shall be approved upon the affirmative vote of the Voting Members casting a majority of the total votes of the Unit Owners.

(3) If the amendment has not been approved by the unanimous vote of the Board of Directors, then the amendment shall be approved by the affirmative vote of the Voting Members casting not less than  three-fourths (3/4ths) of the total votes of the Unit Owners.

(4) Said amendment shall be recorded and certified as required by law.

(5)  No amendment shall be passed which shall impair or prejudice the Association's rental rights under Section VII of the Declaration.

## ARTICLE XI. NOTICES.

Whatever notices are required to be sent hereunder  shall be delivered or sent in accordance with the applicable provisions for notices, as set forth in the March 2005 Restated Declaration to which these March 2005 Restated Bylaws pertain.

Doc
0000186691  Bk OR 11201 Vol 1  Pg 159

7

## ARTICLE XII. INDEMNIFICATION

The Corporation shall indemnify every Director and every Officer, and their heirs, executors and administrators, against all loss, cost and expenses reasonably incurred in connection with any action, suit or proceeding to which said Director or Officer may be a party, by reason of their being or having been a Director or Officer of the corporation, including reasonable counsel fees to be approved by the Corporation, except as to matters wherein said Director or Officer shall be finally adjudged in such action, suit or proceeding to be liable for or guilty of gross negligence or willful misconduct. The foregoing rights shall be in addition to and not exclusive of all other rights to which such Director or Officer may be entitled.

## ARTICLE XIII. LIABILITY SURVIVES TERMINATION OF MEMBERSHIP

The termination of membership in the Condominium shall not relieve or release any such former member or owner from any liability or obligations incurred under or in any way connected with the Condominium during the period of such ownership and membership, or impair any rights or remedies which the Association may have against such former owner and member arising out of or in any way connected with such ownership and membership, and the covenants and obligations incident thereto. `  .

## ARTICLE XIV. LIMITATION OF LIABILITY

Notwithstanding the duty of the Association to maintain and repair parts of the Condominium Property, the Association shall not be liable for injury or damage caused by a latent condition in the property, nor for injury or damage caused by the elements, or by other owners or persons.

## ARTICLE XV. PARLIAMENTARY RULES

Roberts Rules of Order (latest edition) shall govern the conduct of the Association meetings when not in conflict with the Condominium Act, March 2005 Restated Declaration or these March 2005 Restated Bylaws.

March 2005 Restated Bylaw

Doc 00018691 Bk OR 11201 Vol 1600 Pg

## ARTICLE XVI. LIENS

**Section 1. Protection of Property** - All liens against a Condominium Unit, other than for permitted mortgages, taxes, or special *ad valorem* assessments, shall be satisfied or otherwise removed within thirty (30) days of the date the lien attaches. All taxes and special *ad valorem* assessments upon a Condominium Unit shall be paid before becoming delinquent, as provided in these Condominium Documents, or by law, whichever is sooner.

**Section 2. Notice of Lien** - A Unit Owner shall give notice to the Association of every lien upon his Unit, other than for permitted mortgages, taxes and special *ad valorem* assessments, or said Article VIII, Section 2 liens, within five (5) days after the attaching lien.

**Section 3. Notice of Suit** - Unit Owners shall give notice to the Association of every suit or other proceeding(s) which will or may affect title to said owner's Unit or any other part of the property, such notice to be given within five (5) days after the Unit Owner receives notice thereof.

**Section 4. Failure to comply** with this Article concerning liens will not affect the validity of any judicial sale.

**Section 5. Permitted Mortgage Register** - The Association shall maintain a register of all permitted mortgages and at the request of a mortgagee the Association shall forward copies of all notices for unpaid assessments or violations served upon a Unit Owner to said mortgagee.

**ARTICLE XVII. RULES AND REGULATIONS – Intentionally Omitted** from these Bylaws and now set forth and recorded as a separate document titled March 2005 Restated Rules and Regulations.

## ARTICLE XVIII. CONFLICT WITH ORIGINAL BY-LAWS

In the event of any conflict between these March 2005 Restated By-Laws for Long Island Village Owners Association, Inc., a Condominium Association, and the original Bylaws for Outdoor Resorts/South Padre, a Condominium, these March 2005 Restated Bylaws shall prevail.

March 2005 Restated Bylaws

**APPROVED AND DECLARED** on this _____ day of _____ in the Year 2005, AS **THE MARCH 2005 RESTATED BYLAWS OF LONG ISLAND VILLAGE OWNERS' ASSOCIATION, INC.,** A Texas non-profit corporation.

LONG ISLAND VILLAGE OWNERS ASSOCIATION, INC.

BY _____
Don Halbach, President

ATTEST:

_____
LeRoy R. Mulch, Secretary

*Acknowledgments*

State of Texas     §
                   §
County of Cameron  §

This instrument was acknowledged before me on this 10 day of March, 2005, by Don Halbach, President of Long Island Village Owners Association, Inc., a Texas non-profit corporation, on behalf of said corporation.

_____
Notary Public in and for
Cameron County, Texas

VANESSA L. GARCIA
Notary Public, State of Texas
My Commission Expires
State of '            §  April 02, 2008

County of Cameron  §

This instrument was acknowledged before me on this 10 day of March, 2005, by LeRoy R. Mulch, Secretary of Long Island Village Owners Association, Inc., a Texas non-profit corporation, on behalf of said corporation.

_____
Notary Public in and for
Cameron County, Texas

VANESSA L. GARCIA
Notary Public, State of Texas
My Commission Expires
April 02, 2008

After recording, return to:
Ramona K. Kantack
The Rentfro Faulk Law Firm
185 E. Ruben M. Torres Sr. Blvd.
Brownsville, TX  78526

March 2005 Restated Bylaws